IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-60276
Summary Calendar
_____

VICKIE MACMILLAN, Individually
and as Mother and Next Friend
of Tanya Lee, a Minor, ET AL.,

                              Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA,

                              Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Mississippi
(CA-1:92-438)
_____
(January 12, 1995)

Before KING, JOLLY and DeMOSS, Circuit Judges.

PER CURIAM:[*]

    Vickie MacMillan, acting on behalf of herself and as the
next friend of her daughter, Tanya Lee, brought suit under the
Federal Tort Claims Act, 28 U.S.C. § 1345.  MacMillan alleged
that Air Force physicians negligently caused neurological damage
to Tanya Lee when she was born.  The government moved for summary

_____

    [*]Local Rule 47.5 provides:  "The publication of opinions
that have no precedential value and merely decide particular
cases on the basis of well-settled principles of law imposes
needless expense on the public and burdens on the legal
profession."  Pursuant to that Rule, the court has determined
that this opinion should not be published.

judgment, contending that because the limitations period had run, the district court lacked subject matter jurisdiction over the suit.  The district court agreed and granted summary judgment in favor of the government.  MacMillan appeals, but we affirm the district court's decision.


I.  BACKGROUND

On November 23, 1975, Tanya Lee was born to Vickie Lee (now Vickie MacMillan) at Keesler Air Force Base Hospital in Biloxi, Mississippi.  The birth was rife with complications.  MacMillan recalled that Tanya was "born with the cord around her neck" and appeared "blue black" just after she was born.  The Air Force physicians conducting the delivery advised MacMillan that Tanya was "not breathing on her own" but instead was being "artificially ventilated."  In fact, the birth was so problematic that the infant Tanya was taken "out of the room very quickly after delivery," and MacMillan was told that "the child would probably not live, [because she had been] deprived of oxygen for a long period of time."

During the first twenty-four to forty-eight hours of Tanya's life, the situation remained bleak.  Dr. Long, the high-risk pediatrician, told MacMillan that Tanya "had experienced a couple of seizures, was on a life-support system, [and had] no response."  Dr. Long also informed MacMillan that Tanya was "oxygen-depressed" and that "if the child should live she would be severely retarded."  Furthermore, Dr. Long advised MacMillan,

2

"[I]t doesn't look great.  Don't get your hopes up.  The child probably would not make it.  If she should [survive], then she could be a vegetable."

Fortunately, Tanya made some progress, and MacMillan noted that "after 48 hours [Dr. Long] got a sign of life in [Tanya] where she responded to something."  Tanya eventually was weaned off of the ventilator, and about two weeks after she was born, Tanya was able to go home with her mother.  When Tanya was released, Dr. Long informed MacMillan that "there would be no way to determine whether [Tanya] would experience any long-term effects from the events of labor until tests were done on her when she was a few months[] or several years old."  MacMillan also noted that Dr. Long told her that Tanya was "responding well."

Despite her improvement, Tanya continued to experience seizures, and she was given phenobarbital to help control them.  Additionally, MacMillan was instructed that Tanya would need to be seen at the high-risk clinic "on a regular, routine basis . . . for a one-year period of time to monitor her, to see how she was progressing as a result of the problems she had at birth."  During these visits, the clinic performed tests on Tanya's reflexes, growth, and measurements, and MacMillan recalled that "they all seemed to be progressing."  After about twelve months, Tanya was taken off the phenobarbital, and she was seen at the high-risk clinic for the "normal course of pediatric visits."

Tanya's subsequent development did not progress at a normal pace. She began walking "a little later than most kids," and in 1977, because Tanya's "speech was way behind," MacMillan enrolled her daughter in a speech therapy program. When Tanya entered school, her problems continued: "[e]very school year, [MacMillan] could see that there was a problem." MacMillan stated that Tanya repeated the second grade and was an easily frustrated and "very, very shy child."

Concerned that Tanya might be suffering from a learning disability, MacMillan implored her local school district to evaluate Tanya. After MacMillan's entreaties went unanswered for several years, in July of 1988, she took Tanya to Dr. William Gasparrini, a clinical psychologist. Dr. Gasparrini conducted a psychological evaluation of Tanya.

In the report he issued to MacMillan, Dr. Gasparrini reported that "Tanya was described as being a blue baby at birth. There was no oxygen to her brain." Dr. Gasparrini also noted that:

> Tanya's early development was not normal because of her medications and her medical problems. At a very young age she had a few epileptic seizures. She was on anti-epileptic medication until age one, but she has not had any more seizures since that time and has not required

4

continuing treatment with medications. . . .[1]  Labor and delivery were severe problems for Tanya.

After conducting a battery of tests, Dr. Gasparrini concluded that "the most important primary diagnosis for Tanya Lee appears to be Mild Mental Retardation.  She also shows a very significant affective disorder which could be diagnosed as Dysthymia."  In her deposition, MacMillan also agreed that "at least as of July 21, 1988," after receiving Dr. Gasparrini's report, she was "of the opinion that [Tanya's] early development problems were related to her problems at birth and her phenobarbital."  Moreover, at this time, MacMillan admitted that she was not aware of anything that "would have explained the early developmental delays or the low IQs or the shyness or the frustration level increases other than either the phenobarbital or the problems at birth."

In December of 1988, the Biloxi school system finally acquiesced to MacMillan's request for an evaluation of Tanya.  The schools system referred Tanya to a school psychologist, Dr. Anthony W. Pollard.  Dr. Pollard saw Tanya three times and issued a psychological assessment in early February of 1989.  In the "reason for referral" section of the assessment, Dr. Pollard

---

[1]  It is unclear whether this conclusion is correct.  In her deposition MacMillan noted that:

> [W]ith the school case since seventh grade is when I found out that the child has been having these mild seizures all along, for all those years, and I never knew.  They were the staring type, those type of seizures.  She had been having them all this time.  I never knew.

described the circumstances of Tanya's birth, apparently with some inaccuracies,[2] and noted that "it appears likely that Tanya suffered anoxia at birth and probably sustained some neurological damage as a result."

In June of 1989, Victoria Henning, a graduate student at the University of Southern Mississippi, "perform[ed] diagnostic testing on Tanya Lee as part of [Henning's] course requirements." Although she did not suspect actual brain injury, after conducting tests, Henning "suggested that Tanya be evaluated by a neurologist." MacMillan eventually took Tanya to a neurologist-- Dr. Joe Jackson. After conducting an MRI and an EEG, Dr. Jackson informed MacMillan, in early July of 1989, that his examination revealed "old scarring of the brain, and he related it to her birth."

On July 2, 1991, MacMillan filed an administrative complaint, and on September 3, 1992, MacMillan filed a complaint against the United States in the district court. The government responded with a motion for summary judgment, arguing that "the undisputed facts adduced through [MacMillan's] deposition testimony and the two psychologists' evaluation reports support the conclusion that [the district] Court lacks jurisdiction over the subject matter of this action because the statute of

---

[2] Dr. Pollard's report noted that Tanya was born via surgery and that she remained in intensive care for two months. MacMillan states that both of these statements are incorrect.

limitations has expired."[3]  The district court granted the government's motion, concluding that, "the two-year statute of limitations has expired.  Clearly, [MacMillan] knew the facts regarding both her child's injury (neurological damage) and the admitted cause of that injury (delivery difficulties such as the deprivation of oxygen at birth)."  MacMillan appeals, arguing that the district court erred in concluding that the limitations period expired before she filed her claim.

## II.  STANDARD OF REVIEW

We review the granting of summary judgment de novo, applying the same criteria used by the district court in its initial examination of the issue.  Norman v. Apache Corp., 19 F.3d 1017, 1021 (5th Cir. 1994); Conkling v. Turner, 18 F.3d 1285, 1295 (5th Cir. 1994).  Initially, we examine the applicable law to ascertain the material factual issues.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); King v. Chide, 974 F.2d 653, 655-56 (5th Cir. 1992).  We then review the evidence bearing on those issues, viewing the facts and inferences drawn from that evidence in the light most favorable to the nonmoving party. Lemelle v. Universal Mfg. Corp., 18 F.3d 1268, 1272 (5th Cir. 1994); FDIC v. Dawson, 4 F.3d 1303, 1306 (5th Cir. 1993), cert. denied, 114 S. Ct. 2673 (1994).  After this process, summary judgment is proper "if the pleadings, depositions, answers to

---

[3]  The failure to timely file an administrative claim under the Federal Tort Claims Act is a jurisdictional defect.  See Zavala v. United States, 876 F.2d 780, 782 (9th Cir. 1989)

7

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).

Additionally, Rule 56(c) of the Federal Rules of Civil Procedures prescribes that the party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion and of identifying the portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Norman v. Apache Corp., 19 F.3d 1017, 1023 (5th Cir. 1994).  If the moving party meets its burden, the burden then shifts to the nonmoving party who must establish the existence of a genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 585-87 (1986); Norman, 19 F.3d at 1023. Notably, the non-moving party cannot carry its burden by simply showing that there is some metaphysical doubt as to the material facts.  Matsushita, 475 U.S. at 586.  If, however, "the evidence is such that a reasonable jury could return a verdict for the non-moving party," summary judgment will not lie.  Anderson, 477 U.S. at 248.

### III.  DISCUSSION

The limitations period for tort claims brought against the United States is set forth in the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2401(b).  The Act provides that "[a] tort

8

claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . . "  28 U.S.C. § 2401(b).  Additionally, under the FTCA, the limitations period is not tolled during the minority of the putative plaintiff; rather "his parent's knowledge of the injuries is imputed to him." Zavala, 876 F.2d at 782.

In medical malpractice cases, "where the injury or its cause may not be manifested to the plaintiff until many years after the event, the tort action does not `accrue' for statute of limitations purposes, until the plaintiff is put on notice of the wrong."  Waits v. United States, 611 F.2d 550, 552 (5th Cir. 1980); see also United States v. Kubrick, 444 U.S. 111, 122-24 (1979); Harrison v. United States, 708 F.2d 1023, 1027 (5th Cir. 1983).  Accordingly, we have noted that "`in medical malpractice cases . . . the statute of limitations period does not begin to run until after the patient discovers or in the exercise of reasonable diligence should discover his injury and its cause.'" Harrison, 708 F.2d at 1027 (quoting Stoleson v. United States, 629 F.2d 1265, 1268 (7th Cir. 1989)); see also Taurel v. Central Gulf Lines, Inc., 947 F.2d 769, 771 (5th Cir. 1991) (noting that in latent injury cases the cause of action does not accrue until "the date that the plaintiff discovers, or reasonably should have discovered, both the injury and its cause" (internal quotation and citation omitted)).

The putative plaintiff, however, need not know the legal or medical significance of an act or an injury for the cause of action to accrue. Instead, the limitations period begins to run when the plaintiff has "knowledge of facts that would lead a reasonable person (a) to conclude that there was a causal connection between the treatment and injury or (b) to seek professional advice, and then with that advice, to conclude that there was a causal connection between the treatment and injury." Harrison, 708 F.2d at 1027. As the Supreme Court noted:

> A plaintiff . . . armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community. To excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the limitations statute which is to require the reasonably diligent presentation of tort claims against the Government.

Kubrick, 444 U.S. at 123 (footnote omitted).

Despite MacMillan's numerous contentions to the contrary, it is clear that Dr. Pollard's report provided facts sufficient to compel a reasonable person to seek professional advice regarding Tanya's neurological difficulties and the connection, if any, to the problems associated with her birth. Dr. Pollard's report stated that, "it appears likely that Tanya suffered anoxia at birth and probably sustained some neurological damage as a result." Neither the factual inaccuracies in the report nor the fact that Dr. Pollard is not a medical doctor diminishes this conclusion. Dr. Pollard is a psychologist who was examining Tanya for the purpose of determining the causes of her developmental and neurological problems. In light of the

10

information that MacMillan knew about Tanya's difficulties at birth, Pollard's conclusions about the roots of Tanya's later problems certainly were sufficient to lead a reasonable person to inquire in the medical and legal community.  Accordingly, we conclude that MacMillan's cause of action accrued, at the latest when she received Dr. Pollard's report in February of 1989.

MacMillan's argument that the government concealed the cause of Tanya's injury and thereby tolled the limitations period is unavailing.  It is true that the statute of limitations may be tolled when "`the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain.'"  Harrison, 708 F.2d at 1028 (quoting Kubrick, 444 U.S. at 122).  That, however, is not the situation in the instant case.  Simply, there is no indication that medical personnel withheld any information about the facts of Tanya's birth or about her medical records.  Cf. id. at 1023-26 (describing how defendants suppressed x-rays and reports that constituted the "only direct evidence of the thalamic injury").

Similarly, MacMillan's contention that her reliance on the statements of the medical personal at Keesler prevented the accrual of her cause of action is unpersuasive.  MacMillan is correct in noting that Nicolazzo v. United States, 786 F.2d 454 (1st Cir. 1986), and the other cases she cites do indicate that the cause of action does not accrue until the plaintiff receives a correct diagnosis.  Even assuming, however, that MacMillan's reliance on the statement made at Tanya's initial discharge from

11

the hospital--"the tests results showed no evidence of brain damage as a result of the events of her birth"--was reasonable, Dr. Pollard provided an accurate diagnosis in February of 1989, and the claim accrued no later than then.

## IV.  CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.