United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 9, 2006**

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

———————

m 05-51125

———————

NITA HAYNES JOHNSON,
INDIVIDUALLY AND AS NEXT FRIEND OF TALAYA HAYNES, A MINOR,

Plaintiff-Appellant,

VERSUS

UNITED STATES OF AMERICA,

Defendant-Appellee.

———————

Appeal from the United States District Court
for the Western District of Texas

———————

Before SMITH, GARZA, and CLEMENT,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Nita Johnson, individually and as next friend of Talaya Haynes, her minor daughter, filed this Federal Tort Claims Act ("FTCA") action, and the district court granted summary judgment for the United States based on Johnson's failure to file her administrative claim within two years after accrual pursuant to 28 U.S.C. § 2401(b). The court, noting that the summary judgment motion was late according to the pretrial order, nonetheless considered it because the government cited caselaw suggesting that the issue is jurisdictional and thus could be considered at any time. The court further noted that Johnson did not contest whether the statute of limitations is jurisdictional. Johnson appeals, arguing that the court did not have authority to address the late summary judgment motion and incorrectly held that limitations had run. We affirm.

I.

Johnson was seventeen years old and pregnant; she received pre-natal care at Blanchfield Army Community Hospital. During a pre-natal checkup on April 20, 1994, a nonstress test was ordered to monitor the fetal heart rate. The results showed variable decelerations, so Johnson was admitted to the labor and delivery ward.

The following day, by means of a "crash cesarean section" procedure, Johnson gave birth to Talaya. Medical records show that she was floppy, apneic (suffering from an absence of breathing), and dusky at birth and "was without a heart rate or respiratory effort." There were two unsuccessful efforts to resuscitate her by providing oxygen, before a third effort succeeded. Talaya was placed on a ventilator.

In her deposition, Johnson remembered that, at Talaya's four-month checkup, a nurse had been concerned about her daughter and had told her that Talaya was not doing what she was supposed to be doing at four months. Johnson later gave a medical history to Nancy Trent, a pediatric nurse practitioner at a children's clinic on November 17, 1994, when Talaya was about seven months old. From her observations of Talaya and her history taken from Johnson, Trent reported that Talaya was very rigid, especially in the upper body, had exaggerated, developed triceps and biceps to hold her torso up, did not breathe at birth for five minutes, and had neo-natal seizures.

On November 21, 1994, Trent referred Talaya to a pediatrician, Quentin Humberd, who stated that he had seen Talaya because of concerns of developmental motor delay; after an examination, he concluded that Talaya had neurological findings that were beyond the range of normal for her age. Humberd wanted to rule out

cerebral palsy and referred Talaya to the Tennessee Early Intervention System ("TEIS"). Humberd recalled that at the November 21 visit he obtained most of the history from Johnson and that he learned that Talaya had had a difficult birth, including asphyxia. He indicated that he was trying to relate what the mother was describing about the problems at birth to the developmental problems he was noticing.

On December 2, TEIS received the referral of Talaya from the clinic; the reason given for referral was possible cerebral palsy. The intake form indicated (in the section containing information provided by Johnson) that Talaya had not been breathing when born and had spent two weeks in the hospital on oxygen and that Johnson had had a C-Section because Talaya's heart rate had dropped.

A developmental assessment of Talaya was conducted in January 1995, after which she was seen by the assessor for an hour each week from March 1995 until June 27, 1996, when Johnson moved to Texas. Some time during this period, the assessor was told by Johnson that "it might have happened at birth" and that she had contemplated suing the Army. In cross-examination, the assessor clarified that Johnson had not said that she had been told that the doctors or nurses had been negligent or that anyone had done anything wrong, but only that Johnson "thought that it might have happened at birth."

On February 3, 1995, at a nine-month examination, Humberd assessed Talaya's condition as consistent with a static encephalopathy (brain dysfunction) "and most likely Cerebral Palsy." Humberd recalled that

2

Johnson had come back in for a conference at which he had explained to her that her daughter's problems were not from viral infection or another degenerative condition but instead were the result of something that had happened at some specific time, an event such as low oxygen or trauma. He then gave her a handout on cerebral palsy and a reading list about support "so that [she] could talk to other families . . . that had cerebral palsy, et cetera."

Humberd explained in his deposition that he suspected an association between Talaya's brain injury and her birth by emergency C-section. He explained that he did not definitively know what had caused Talaya's cerebral palsy, so he did not tell Johnson, during their February 3 discussion, specifically what had caused the brain damage. Nonetheless, he did "entertain a 'differential diagnosis' that there was a connection between Talaya's birth trauma and [her] cerebral palsy"and "presented it to Mrs. [] Johnson as 'one of the potential causes of why a child can have this kind of problem . . . .'"

On March 13, 1995, Johnson was interviewed by a physical therapist, Gay Lynn Westover. In her notes of that meeting, Westover stated that she was told by Johnson that Talaya had had breathing problems at birth, a decreased heart rate, had been in an incubator, and had experienced developmental delays as early as three months after birth. Eventually, Talaya was given a definitive diagnosis of cerebral palsy, most likely in April 1995, when she was twelve months old.

In the summer of 1996, Johnson and Talaya moved to Texas, where Talaya continued to receive medical care through the Army. On June 6, 1997, Johnson gave birth to another daughter, Tatyana, who has shown no subsequent signs of developmental problems, at Beaumont Army Medical Center in El Paso. Johnson recalled that, after the baby's heart rate dropped, the doctors delivered Tatyana by C-section.

Johnson recalled no one telling her that Tatyana had stopped breathing at birth. In her deposition, Johnson testified that in 2000, over two years after her second daughter's birth, she "saw a commercial on TV about cerebral palsy," a "lawyer's commercial . . . saying if your child has cerebral palsy this might be the reason." She testified that she contacted her lawyers "[r]ight after" seeing the commercial. On May 10, 2001, she filed an administrative claim, and she sued on December 27, 2002.

II.

Johnson argues that the district court did not have authority to address the late-filed summary judgment motion, because the FTCA's statute of limitations is not jurisdictional. We agree with the district court's decision, however, because even if that statute of limitations were not jurisdictional (an issue that, as the district court noted, appears to be undecided by this court), the district court had authority to grant summary judgment notwithstanding the fact that the motion was filed later than provided in the pretrial order.

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, *at any time*, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. P. 56(b) (emphasis added). Because here the defendant moved for summary judgment before trial, the motion was timely under rule

3

56(b).[1] Though the caselaw expresses some concerns about the granting of summary judgment motions on the eve of trial, *Guillory*, 95 F.3d at 1328, this is not an issue in this case, because the motion was filed a month in advance of the date set for trial.[2]

The violation of the pretrial order does not warrant reversal. Rule 16(f) provides for sanctions that are "just" for violations of pretrial orders. *See* FED. R. CIV. P. 16(f). Johnson did not argue, in the district court, that the summary judgment motion was late or that sanctions should be imposed under rule 16(f). Therefore, she waived these arguments for the purpose of appeal.[3]

A closer issue is whether a pretrial order can abridge rights granted to defendants under FED. R. CIV. P. 56(b).[4] It is uncertain

---

[1] *See Guillory v. Domtar Indus.*, 95 F.3d 1320, 1328 (5th Cir. 1996) ("The timing of the summary judgment does not warrant reversal in this case. Rule 56(b) allows a defendant to move for summary judgment *at any time*. Accordingly, the court may grant summary judgment any time before trial.").

[2] Further, the ten-day notice requirement of rule 56(c) was satisfied. As we explained in *Daniels v. Morris*, 746 F.2d 271, 274-75 (5th Cir. 1984),

Under Fed. R. Civ. P. 56(c) "the motion [for summary judgment] shall be served at least 10 days before the time fixed for the hearing." This rule does not by implication require the district court to hold an oral hearing. As we have previously interpreted it, the rule requires only that, if there is an oral hearing, there be ten-days advance notice; if there is not a hearing, the adverse party must have at least ten days to respond to the motion for summary judgment. Rule 56(c) does not require that a party be given advance notice of a "date certain" on which a motion for summary judgment is to be decided by the trial court.

Although no hearing was held, Johnson had the opportunity to respond to the motion and in fact did so. Therefore, the requirements of rule 56(c) were met. *See id.* at 276-77 ("When, as here, the parties have been given ample opportunity to respond to the motion for summary judgment, the district judge may rule on it even after a significant delay, without giving the parties advance notice of the court's intention to consider and decide the motion on a "date certain."); *see also Hamman v. Southwestern Gas Pipeline, Inc.,* 721 F.2d 140 (5th Cir. 1983) (stating that where appellants had filed a responsive brief, the requirements of Rule 56(c) were satisfied even if the
(continued...)

[2](...continued)
district court did not advise them of when it would decide the summary judgment motion).

[3] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1071 n.1 (5th Cir. 1994) (per curiam) (en banc) (citing *Topalian v. Ehrman*, 954 F.2d 1125, 1132 n.10 (5th Cir. 1992), and explaining that this court's inquiry "is limited to the summary judgment record and the plaintiffs may not advance on appeal new theories or raise new issues not properly before the district court to obtain reversal of the summary judgment").

[4] *Compare Manetas v. Int'l Petroleum Carriers, Inc.*, 541 F.2d 408, 413 (3d Cir. 1976) (holding that "the 45-day Pre-Trial Order limitation for filing motions for summary judgment was not a bar to a later filing because Fed. R. Civ. P. 56(b) expressly authorizes a 'defending party' to move 'at any time' for a summary judgment"), *with Julian v. Equifax Check Servs.*, 178 F.R.D. 10, 16 (D. Conn. 1998) ("The Supreme Court did not intend Federal Rule 16(b)(2) to be ignored when a party filing a summary judgment motion invokes the 'at any time' language of Federal Rule 56. The 'at any time' provision of Federal Rule 56 for filing summary judgment motions must be interpreted to be subject to the case management dictates of Fed-
(continued...)

4

whether the "case management dictates" of rule 16(b) must necessarily prevail over the "at any time" dictates of rule 56(b), and not *vice versa*. There is no indication that one interest is greater than the other, in either rule 16(b) or the advisory notes. Rule 16(b) could certainly also be interpreted to read in harmony with rule 56(b): Although the district court may impose time limits for filing motions, it cannot restrict the limits that are already expressly provided by the rules.

Also unresolved is whether the "case management" concerns are valid in situations such as this one, in which the motion for summary judgment is filed one month in advance of trial. Surely, a defendant who waits that late to file for summary judgment runs the risk that its motion will be denied because the district court may not have enough time to look at it carefully.

This does not mean, however, that "at any time" in rule 56(b) means anything less than what it says. If the motion is denied, the court system is in the same position as if the defendant were not permitted to file at all at that time: The case would go to trial. In the rare case in which a motion for summary judgment will be granted even if it is filed only one month before trial, the plaintiff suffers no prejudice.

Further, it is the scheduling order, not rule 16(b) *per se*, that conflicts with rule 56(b). Because not even local court rules can diminish rights afforded to parties by the rules,[5] it is questionable whether scheduling orders can do so. We need not decide that question here, because Johnson waived the timeliness argument and did not respond to the government's rule 56(b) argument on appeal.

We also note that Johnson did not argue, in the district court, the FTCA's statute of limitations is not jurisdictional; in that court she merely argued that the court had jurisdiction because limitations had not expired. As we have observed, she may not raise, on appeal, theories that she did not raise before the district court. The rule that jurisdictional issues may not be waived but can be raised at any time is not invoked in this case. That rule is grounded on the principle that because federal courts are courts of limited

---

[4](...continued)
eral Rule 16(b)."). *See also Lemon v. Dugger*, 931 F.2d 1465 (11th Cir. 1991) (upholding denial of motion for summary judgment filed outside of scheduling order and suggesting that rule 16(b) prevails over rule 56(b)); *Kennedy v. City of Cleveland*, 797 F.2d 297, 301 & n.6 (6th Cir. 1986) ("Although Fed. R. Civ. P. 56(b) states that a defendant may move for summary judgment 'at any time,' we do not believe that this precludes the district court from controlling the proceedings before it, at least not to the extent of requiring it to consider disruptive motions on the eve of trial.").

[5] *Brown v. Crawford County, Ga.*, 960 F.2d 1002, 1008 (11th Cir. 1992) (invalidating local rule that restricted the right to file a summary judgment motion because "[d]istrict courts . . . must not circumvent the Federal Rules of Civil Procedure by implementing local rules or 'procedures' which do not afford parties rights that they are accorded under the Federal Rules."); *see also Carver v. Bunch*, 946 F.2d 451, 453 (6th Cir. 1991) ("[L]ocal court rules . . . cannot conflict with the Federal Rules of Civil Procedure, Acts of Congress, and rules of practice and procedure prescribed by the Supreme Court."); *Coady v. Aguadilla Terminal Inc.*, 456 F.2d 677, 678 (1st Cir. 1972) ("[A] local rule cannot be applied if it is contrary to a federal statute or rule.")).

jurisdiction,[6] the parties cannot confer subject matter jurisdiction "by indolence, oversight, acquiescence, or consent." *United States v. Horn*, 29 F.3d 754, 768 (1st Cir. 1994). Johnson's challenge is not that subject matter jurisdiction improvidently or erroneously existed, but that the district court should not have considered the late-filed motion. That is an argument she waived by not asserting it in the district court.

## III.

Section 2401(b) bars a tort action against the federal government unless the claim is first presented to the appropriate federal agency "within two years after such claim accrues." *United States v. Kubrick*, 444 U.S. 111, 113 (1979) (citing § 2401(b)). The statute does not define, however, when a claim "accrues." *Johnston v. United States*, 85 F.3d 217, 219 (5th Cir. 1996). The general rule under the FTCA is that a tort action accrues at the time of a plaintiff's injury. *Kubrick*, 444 U.S. at 120. For FTCA medical malpractice cases, however, *Kubrick* adopted a "discovery rule" for claim accrual, under which the time starts to run when the plaintiff has the information necessary to discover "both his injury and its cause." *Id.* This is because, where "the injury or its cause may not be manifested to the plaintiff until many years after the event," the tort action should not accrue, for statute of limitations purposes, "until the plaintiff is put on notice of the wrong." *Waits v. United States*, 611 F.2d 550, 552 (5th Cir. 1980).

As the district court noted, there is no dispute

that Johnson knew about the injury more than two years before she filed her claim, most likely in April 1995, when Talaya was about a year old (which was about six years before Johnson filed her claim). The dispute is whether she knew, or "in the exercise of reasonable diligence should [have] discover[ed]," the cause of Talaya's injury. *MacMillan v. United States*, 46 F.3d 377, 381 (5th Cir. 1995) (quoting *Harrison v. United States*, 708 F.2d 1023, 1027 (5th Cir. 1983)). "The putative plaintiff [] need not know the legal or medical significance of an act or an injury for the cause of action to accrue." *Id.* "Instead, the limitations period begins to run when the plaintiff has 'knowledge of facts that would lead a reasonable person (a) to conclude that there was a causal connection between the treatment and injury *or* (b) *to seek professional advice*, and then with that advice, to conclude that there was a causal connection between the treatment and injury.'" *Id.* (quoting *Harrison*, 708 F.2d at 1027) (emphasis added).

We agree with the district court that *MacMillan* controls and that a reasonable person in Johnson's position would have been aware of enough facts to trigger the statute of limitations more than two years before she filed her claim. In *MacMillan*, a case also involving birth problems resulting in neurological injury, we held that a plaintiff with knowledge of the injury and of a "probable" cause of that injury had a duty "to inquire in the medical and legal community" and "to seek professional advice regarding [the baby's] neurological difficulties and the connection, if any, to the problems associated with her birth." 46 F.3d at 381.

Johnson's attempt to distinguish *MacMillan* is unconvincing. She argues that in

---

[6] Federal courts are courts of limited jurisdiction having subject matter jurisdiction only over those matters specifically designated by the Constitution or Congress. *Epps v. Bexar-Medina-Atascosa Counties Water Improvement Dist.*, 665 F.2d 594, 595 (5th Cir. 1982); *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 548 (Former 5th Cir. Dec. 1981).

6

*MacMillan* the plaintiff "knew" about the cause of the injury, which satisfied *Kubrik*'s requirement that both injury and its cause must be "known" before limitations can run. But in *MacMillan* the plaintiff did not know what the cause of the injury was; she only knew about a potential cause.[7]

Precisely because the "connection" between the birth problems and the neurological problems was not fully known (only "probable"), *MacMillan* imposed a duty to seek advice once this probable cause was revealed to the plaintiff by the doctor, namely "to seek professional advice regarding [the baby's] neurological difficulties and the connection, if any, to the problems associated with her birth." There would be no need to "seek professional advice" about the "connection" between the birth problems and the injury if the "cause" of the injury was known.

Similarly here, a potential (and most likely cause according to the differential diagnosis) was revealed to Johnson by Humberd, who ruled out genetic issues, stroke, fetal infections such as meningitis, congenital defects, and severe prematurity, which left the most likely cause "going back again to the history . . . an association at [the] time that child was born that she had to have [an] emergency C-section." Humberd presented the birth problems to Haynes-Johnson as "one of the *potential* causes of why a child can have this kind of problem at seven months of age, and sometimes that diagnosis can be delayed." Therefore, in April 1995, armed with the diagnostic of cerebral palsy, and knowing about the possible connection between birth injury and cerebral palsy, Johnson should

have "sought advice" about the connection between the two.

Johnson's contention that she did not know of the potential connection between birth injury and cerebral palsy because, when Humberd told her about the connection, Talaya had not been fully diagnosed with cerebral palsy, is questionable. In February 1995, Humberd told Johnson that Talaya might have cerebral palsy and that if she did, the most likely cause was an injury at birth. The diagnosis of cerebral palsy was finalized in April 1995. Therefore, it is meritless to say that the three month lapse erased the mother's notice of the doctor's statement that if Talaya did have cerebral palsy, it was potentially caused by injury at birth.

Johnson also argues that *Osborn v. United States*, 918 F.2d 724, 732 (8th Cir. 1990), supports her argument, not the district court's, because in that case the claim did not accrue even if the plaintiff had learned of a "connection" between the injury and the treatment. To the contrary, however, there was no such "connection" drawn in that case.

There, a doctor ordered that pertussis be stopped, yet at no point was the pertussis connected to the injury. In fact, the court held that it was not "Dr. Oksol's statement [stopping pertussis] may have demonstrated understandable caution and conservative medical judgment, *but it utterly failed to address the issue of causation*." *Id.* at 733. Additionally, in that case plaintiffs had reason not to suspect that pertussis was the cause, because Dr. Schuman had assured her just before the fourth shot was given that it was "perfectly safe." *Id.* at 726. In contrast, here Johnson does not contend that anyone

---

[7] *See MacMillan*, 46 F.3d at 381 ("Dr. Pollard's report stated that, "it appears likely that Tanya suffered anoxia at birth and *probably* sustained some neurological damage as a result.") (emphasis added).

had assured her that Talaya's birth was perfectly uneventful and that cerebral palsy is never caused at birth.

Johnson further contends that the claim did not accrue until she saw the television commercial in 2000, because until then she could not connect Talaya's cerebral palsy to negligent treatment at birth. As the district court noted, this type of argument was squarely rejected by *Kubrick*, which explained that as long as the nature and (potential) cause of the injury are known, a plaintiff need not know that the injury was negligently created.

Johnson knew that Talaya had cerebral palsy and that a potential and likely cause was something that happened at birth. Thus, as *Kubrick* explained, she did not need to know that the treatment at birth was negligent, as long as she knew that some injury could have occurred at birth. Nor, as the district court correctly observed, did she need to know exactly how the injury was inflicted at birth (*e.g.*, asphyxia or improper administration of Pitocin).

Because *MacMillan* controls, we need not decide the correctness of the district court's alternative holding, which is that Johnson does not benefit from the discovery rule, because she failed diligently to inquire about the cause of Talaya's injury.[8] Last, we reject the remainder of Johnson's arguments with respect to when the limitations period begins to run,[9] for the same reasons discussed by the district court.

AFFIRMED.

---

[8] *See., e.g., Osborn,* 918 F.2d at 732 (explaining that "an injured plaintiff cannot claim the benefit of the discovery rule simply by waiting passively for the cause of injury to be revealed").

[9] These are the arguments concerning (1) whether the youth of the plaintiff matters in deciding what a (continued...)

[9](...continued) reasonable person in her situation would do; (2) whether circumstances related to Tatyana's birth matter even if she was born in a different hospital in another state; (3) whether Johnson's belief that the cerebral palsy was mild matters; and (4) whether the statute only began to run when she saw a commercial related to cerebral palsy, even if that commercial did not convey any new information.