In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-2854

E.Y., A MINOR, BY HIS MOTHER AND NEXT FRIEND TENILLE
WALLACE, *et al.*,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 7346 — **Robert W. Gettleman**, *Judge*.

ARGUED MAY 20, 2014 — DECIDED JULY 10, 2014

Before KANNE, TINDER, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Tenille Wallace brings this suit
on behalf of herself and her young son, E.Y., who has been
diagnosed with diplegic cerebral palsy. She alleges that E.Y.'s
illness resulted from medical malpractice by two separate
healthcare providers: the federally-funded Friend Family
Health Center, where she received her prenatal care, and the
private University of Chicago Hospital, where she gave

birth. The present appeal involves the timeliness of her suit based on the actions of the Friend Center.

The Friend Center and its doctors are federally funded, and as explained below, federal law makes Ms. Wallace's suit against the Center a suit against the United States under the Federal Tort Claims Act (FTCA). She needed to file suit against the Friend Center within the FTCA's two-year statute of limitations. See 28 U.S.C. § 2401(b). The district court denied the government's motion to dismiss because Ms. Wallace's claim could have accrued less than two years before she filed suit. Eventually, though, the district court granted summary judgment for the government, finding that Ms. Wallace's suit against the Friend Center and thus the United States was filed about two weeks too late.

Ms. Wallace appeals, arguing that although she was aware she might have a claim against the University Hospital more than two years before filing this suit, she remained unaware that the Friend Center might be involved until she received a partial set of medical records from the Center on December 14, 2006, making her suit timely. Although Ms. Wallace's claims against the University Hospital and other non-federal defendants remain pending in the district court, the district court properly entered a separate final judgment under Federal Rule of Civil Procedure 54(b) on the claims against the United States, so we have jurisdiction over the appeal.

We reverse. Reading the evidence in Ms. Wallace's favor as we must at summary judgment, a reasonable trier of fact could find that Ms. Wallace was unaware and had no reason to be aware of the Friend Center's potential involvement in her son's injuries until less than two years before she filed

her suit. Although Ms. Wallace soon suspected that the University Hospital might have caused her son's injuries during delivery, the evidence does not show beyond reasonable dispute that she similarly suspected or should have suspected that the Friend Center's prenatal care had contributed to her son's injuries until she and her lawyers received incomplete records from the Center suggesting that something was amiss. That did not occur until December 14, 2006. She filed suit less than two years later, on December 10, 2008, so her suit should not have been dismissed on summary judgment as untimely. In essence, we think the district court was correct at the motion to dismiss stage when it denied the government's motion to dismiss on statute of limitations grounds using the same reasoning we adopt here.

I.  *Factual and Procedural Background*

Ms. Wallace appeals from the district court's grant of summary judgment for the government, so we construe all evidence and draw all reasonable inferences from that evidence in her favor. *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001).

In 2004, Tenille Wallace became pregnant with her first child, E.Y. She received her prenatal care at the federally-funded Friend Family Health Center. Her last prenatal appointment took place on March 29, 2005. A week later, on April 4, 2005, Ms. Wallace went to the University of Chicago Hospital for delivery. Things did not go smoothly. Her son, E.Y., was eventually delivered by caesarean section. E.Y. was born limp and purple. Ms. Wallace was not allowed to hold him. Soon thereafter (we are not told exactly when), a doctor at the University of Chicago Hospital told Ms. Wallace that

E.Y. might have suffered oxygen deprivation during delivery.

E.Y. remained at the hospital for many weeks before Ms. Wallace could take him home. He developed slowly. In May 2006, a doctor at La Rabida Children's Hospital diagnosed E.Y. with diplegic cerebral palsy and explained the diagnosis to Ms. Wallace. There is no indication in the record that the doctor told Ms. Wallace that E.Y.'s injuries could have been caused by prenatal complications. That same month, Ms. Wallace discussed what she had learned with her uncle, a Chicago attorney. Based on the information Ms. Wallace shared with him, her uncle told her that she might have a case and recommended that she consult an attorney.

In mid-November 2006, Ms. Wallace met with attorneys at Clifford Law Offices and signed a retainer agreement. On November 28, 2006, her attorneys requested her medical records from both the University Hospital and the Friend Center. On December 14, 2006, the Center provided a partial set of Ms. Wallace's prenatal records to her attorneys. The Center did not provide Ms. Wallace's attorneys with all of her prenatal records until October 2007.

Ms. Wallace filed this suit on December 10, 2008. She alleges that the University Hospital, a Hospital doctor, the Friend Center, and a Center doctor had all committed medical malpractice that caused E.Y.'s injuries. After the case was removed to federal court and the United States was substituted as defendant for the Center and its doctor, the district court dismissed the case against the United States because Ms. Wallace had failed to exhaust available administrative remedies. She then presented her claim to the Department of Health and Human Services, exhausted all available reme-

dies, and re-filed her case in November 2010. (Despite the dismissal, Ms. Wallace's case is still considered to have been filed on December 10, 2008 because she filed her claim with the Department within 60 days of the dismissal. See 28 U.S.C. § 2679(d).)

The government then moved to dismiss Ms. Wallace's re-filed suit on statute of limitations grounds. It argued that Ms. Wallace's claim against the Friend Center had accrued at the latest in November 2006 when her lawyers requested her medical records from both the University Hospital and the Friend Center. That would make Ms. Wallace's December 10, 2008 suit untimely by about two weeks beyond the FTCA's two-year statute of limitations. The district court denied the motion to dismiss, reasoning that requesting medical records from the Center did not necessarily mean that Ms. Wallace suspected that the Center had contributed to E.Y.'s injuries: "it makes sense to obtain all records with respect to a pregnancy and childbirth in pursuing a cause of action." The court concluded that the pleadings did not show that Ms. Wallace's claim accrued before she received the partial set of medical records from the Center on December 14, 2006, making her December 10, 2008 lawsuit timely under the FTCA.

At the close of discovery, the government moved for summary judgment on statute of limitations grounds. The motion repeated many of the same arguments it had made in its motion to dismiss. This time, the court agreed with the government, concluding that Ms. Wallace's claim against the Center accrued by November 2006 when she requested records from both the Center and the Hospital. According to the court, requesting records from the Center "indicated that she understood that the actions of Center doctors could be

related to E.Y.'s injuries," so her claim against the Center had accrued by that time. Since Ms. Wallace had not filed her suit until December 10, 2008, her suit was untimely under the FTCA. The court accordingly granted summary judgment in favor of the United States. This appeal followed.

II. *Analysis*

The Friend Family Health Center is a federally-funded public health center. Federal law treats Ms. Wallace's suit against the Center and one of its doctors as a tort action against the United States. See 42 U.S.C. § 233(g) (federally-funded health centers and their doctors are considered federal employees for purposes of tort claims). The Federal Tort Claims Act (FTCA) and its two-year statute of limitations thus apply to Ms. Wallace's suit against the Center. See 28 U.S.C. § 2401(b). Ms. Wallace filed her lawsuit on December 10, 2008, so her claim must have accrued on or after December 10, 2006 for her suit to be timely. Federal law governs when a claim accrues under the FTCA. *McCall v. United States*, 310 F.3d 984, 987 (7th Cir. 2002).

Our circuit's case law regarding when a medical malpractice claim under the FTCA accrues has been evolving over the past several decades. Beginning with *Stoleson v. United States*, 629 F.2d 1265, 1268 (7th Cir. 1980), we have said repeatedly that a claim accrues when the plaintiff discovers, or a reasonable person in the plaintiff's position would have discovered, that she has in fact been injured by an act or omission attributable to the government. E.g., *Arroyo v. United States*, 656 F.3d 663, 668 (7th Cir. 2011); *Jastremski v. United States*, 737 F.2d 666, 669 (7th Cir. 1984). That standard has two alternative tests: a subjective one focused on the plaintiff's actual knowledge, and an objective one based on the

knowledge of a reasonable person in the plaintiff's position. *Arroyo*, 656 F.3d at 669. Either form of knowledge is sufficient to start the clock on the statute of limitations. To determine when a claim accrued, we must consider both when the plaintiff knew her injury's cause and when a reasonable person in the plaintiff's position would have figured it out. *Id.*

Under this standard, accrual depends on when the plaintiff (or a reasonable person in the plaintiff's position) would have actually discovered that the government is responsible for her injuries. Starting with *Nemmers v. United States*, however, we have also said that the statute of limitations starts to run "when the plaintiff has the information *necessary to discover* both his injury and its cause." 795 F.2d 628, 629 (7th Cir. 1986) (emphasis added); see also *Arteaga v. United States*, 711 F.3d 828, 831 (7th Cir. 2013); *Arroyo*, 656 F.3d at 669. In other words, a plaintiff's claim accrues when "an individual acquires information that would prompt a reasonable person to make 'a deeper inquiry into a potential [government-related] cause.'" *Arroyo*, 656 F.3d at 669, quoting *Nemmers*, 795 F.2d at 632; see also *Arteaga*, 711 F.3d at 831.

Under this different rule, the issue is not when a reasonable person would have actually discovered the government's involvement. Instead, the issue is when a reasonable person would have been prompted to *inquire further* as to the government's potential involvement in her injuries. *Id.* Under this test, accrual no longer waits for discovery of actual causation but is triggered instead by information sufficient to prompt a reasonable person to inquire.

Neither *Arteaga* nor *Arroyo* explicitly rejected the earlier actual knowledge rule, and our previous cases also have not

addressed the tension between the actual knowledge rule and the emerging rule based on inquiry notice. See *Arteaga*, 711 F.3d at 831 (citing the old standard and then, "equivalently," the new one); *Arroyo*, 656 F.3d at 669 (citing both standards without comment). In our view, however, these cases show a common-law evolution that spans thirty years of case law and has produced a new standard for claim accrual under the FTCA.[1]

Under these circumstances, we see no reason to avoid recognizing that new standard. We hold, therefore, that a plaintiff's medical malpractice claim against the federal government accrues when either (1) the individual becomes subjectively aware of the government's involvement in the injury, or (2) the individual acquires information that would prompt a reasonable person to inquire further into a poten-

---

[1] Other circuits have also moved toward an inquiry notice rule for accrual of medical malpractice claims under the FTCA. See, e.g., *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998) (a claim accrues when the plaintiff has "knowledge of, or knowledge that could lead to, the basic facts of the injury, i.e., knowledge of the injury's existence and knowledge of its cause or of the person or entity that inflicted it") (internal citation and quotation omitted); *Hughes v. United States*, 263 F.3d 272, 275 (3d Cir. 2001) ("the statute of limitations is tolled until the putative plaintiff possesses facts which would enable a reasonable person to discover the alleged malpractice") (internal quotation and citation omitted); *Johnson v. United States*, 460 F.3d 616, 621 (5th Cir. 2006) ("the limitations period begins to run when the plaintiff has knowledge of facts that would lead a reasonable person (a) to conclude that there was a causal connection between the treatment and injury *or* (b) *to seek professional advice*, and then with that advice, to conclude that there was a causal connection between the treatment and injury") (internal quotations and citations omitted, emphasis in original).

tial government-related cause of the injury, whichever happens first. *Arteaga*, 711 F.3d at 831; *Arroyo*, 656 F.3d at 669.[2]

This case presents a new twist on this problem. Our prior cases involving accrual of medical malpractice claims under the FTCA have presented questions about when a plaintiff should have realized that an injury was caused by medical malpractice rather than having been a result of natural illnesses or processes. In those cases, the government was the only potential tortfeasor. See, e.g., *Arteaga*, 711 F.3d at 830; *Arroyo*, 656 F.3d at 671; *Drazan v. United States*, 762 F.2d 56, 58–59 (7th Cir. 1985). In that situation, when a patient is injured, suspecting any doctor-related cause is equivalent to suspecting a governmental cause because the government is the only institution that treated the patient. See, e.g., *Arroyo*, 656 F.3d at 670–71 (using "government-related cause" and "doctor-related cause" interchangeably).

This case presents a different problem. Ms. Wallace received care from two different institutions, one governmental and one private. E.Y.'s injuries could have been the result of malpractice by either institution or both or neither. This case therefore requires us to determine when a medical malpractice claim under the FTCA accrues when there are mul-

---

[2] This rule is consistent with *United States v. Kubrick*, 444 U.S. 111, 123 (1979), which held that claim accrual under the FTCA is not delayed until a potential plaintiff knows that his injury was caused by malpractice. *Kubrick* was focused on accrual based on a plaintiff's subjective knowledge rather than what a reasonable person in the plaintiff's position would suspect. It also did not address when a potential plaintiff has sufficient knowledge about her injury's cause to start the statute of limitations running. In any case, under both *Kubrick* and the claim accrual standard we adopt here, a plaintiff's FTCA claim has accrued by the time she is subjectively aware of both her injury and its cause. See *id.*

tiple potential tortfeasors, some governmental and some private.

The government argues for a simple rule: suspecting *any* doctor-related cause for an injury should trigger the statute of limitations as to *all* doctor-related causes for that injury, whether private or governmental. We do not think this is a sound rule, nor is it consistent with the reasoning of our prior case law. In both *Arroyo* and *Drazan*, the plaintiff's injuries could have been caused by two things: nature and/or the government. We held in both cases that knowledge of one potential cause did not start the statute of limitations running as to all potential causes. *Arroyo*, 656 F.3d at 671; *Drazan*, 762 F.2d at 59. Rather, "the knowledge that is required to set the statute of limitations running is knowledge of the government cause, not just of the other cause." *Drazan*, 762 F.2d at 59. This same logic applies in a situation where the plaintiff's injuries could have been caused by several different non-natural causes, some governmental and some private. In such a situation, the plaintiff (or a reasonable person in her position) may not suspect that the government caused or contributed to her injuries even when she comes to suspect a private actor was negligent.

In applying the FTCA statute of limitations to claims of medical malpractice, we have long avoided requiring would-be plaintiffs to engage in paranoid investigations of everyone who has ever provided them with medical care. *Drazan*, 762 F.2d at 59 (rejecting rule that would have the "rather ghoulish consequence" of requiring such investigations); *Arroyo*, 656 F.3d at 671–72; *Nemmers v. United States*, 795 F.2d 628; 631–32 (7th Cir. 1986). The relationship between doctor and patient is built on trust. Doctors have the obligation to

care for their patients and the specialized knowledge to make good medical choices and to deliver effective care. Patients typically lack specialized medical knowledge and are unable to assess and treat their own maladies. They put their trust in doctors to provide competent medical care. And all should recognize that even the best medical care cannot guarantee a good outcome. A negative outcome of medical care is not proof of negligence. Given the complexities of the human body, its injuries and illnesses, and medical treatment, and the special relationship between doctor and patient, the law should not encourage patients to assume their doctors are responsible for negative outcomes, let alone penalize patients who do not turn on their doctors at the first sign of trouble. The government's proposed rule would encourage just this sort of behavior. We decline to adopt it.

We agree with the government, however, that adopting a rule that unduly narrows the scope of related claims and causes would also have troubling consequences. Statutes of limitations serve important purposes, including protecting "defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *United States v. Kubrick*, 444 U.S. 111, 117 (1979). These considerations are even more important in the context of the FTCA, which waives the United States' sovereign immunity. The statute of limitations is a condition of that waiver and thus should not be extended by judicial interpretation. *Id.* at 117–18. Adopting too narrow a view of which doctor-related causes are sufficiently connected to a suspected cause would have the effect of eroding the FTCA's statute of limitations, a result we have many reasons to avoid.

*Goodhand v. United States*, 40 F.3d 209 (7th Cir. 1994), of-
fers some guidance in approaching the question of claim ac-
crual when there is more than one potential tortfeasor. In
*Goodhand*, the plaintiff had suffered an injury as a result of
two different medical procedures carried out by the same
doctor in close succession: birth of her baby and a later sur-
gical repair of a perineal tear. She sued, alleging that the doc-
tor had committed medical malpractice during both proce-
dures. One question in the case was whether the plaintiff's
suspicion that the first medical procedure (the delivery
method) had caused her injury would trigger the statute of
limitations as to the second medical procedure (the surgical
repair). We held that it did not. Although the same doctor
had carried out both procedures, "we cannot think of a rea-
son why the case should be decided differently than if two
different doctors had been responsible for the two mistakes,
the two injuries. Then certainly the running of the statute of
limitations against one for his act would not bar a suit
against the other based on the other's act." 40 F.3d at 215.

*Goodhand* suggests a straightforward approach to our
present problem. When a person suspects, or a reasonable
person would suspect, that her injury was caused by negli-
gent medical care, claims regarding other doctor-related
causes of that injury that share a time and place with the in-
jury's suspected cause also accrue. All claims arising from
the same surgery, for example, against surgeon, anesthetist,
and nurse, would arise together. However, claims that are
distinct in time, or distinct in place, or that relate to a differ-
ent injury do not accrue solely on that basis. This test is con-
sistent with *Goodhand* and our other prior FTCA cases and
maintains limits on claim accrual without undermining the
FTCA's statute of limitations. To stay consistent with

*Goodhand*, though, the differences in time and place may be quite small, as in the time between the *Goodhand* baby's birth and the surgical repair of the perineal tear.

We now examine whether Ms. Wallace's suit is timely under this approach. The prenatal care Ms. Wallace received at the Friend Center and the care she received at the University Hospital during delivery differed in both time and place. A reasonable person would not necessarily have suspected that the Center's care was negligent merely because she suspected that the Hospital's care was negligent. Viewing the evidence through the summary judgment lens, and giving Ms. Wallace the benefit of conflicts in the evidence and reasonable inferences favorable to her case, the earliest time she possessed enough information to make a reasonable person inquire further about the Center's possible negligence was December 14, 2006, when she and her lawyers received her partial records from the Center. Only at that time was there a solid indication that something might have been amiss with her prenatal care, making that the first time that a reasonable person necessarily would have inquired further. See *Arroyo*, 656 F.3d at 669. Unless Ms. Wallace subjectively had solid grounds for suspecting that the Center had committed medical malpractice before she and her lawyers received the partial records from the Center, her suit is timely. *Id.*

The government argues that the requests for records from both the University Hospital and the Friend Center show that Ms. Wallace suspected that the Center had caused or contributed to E.Y.'s injuries. That is one plausible inference, but it is not the only one. One could also reasonably infer, as the district court did at the motion to dismiss stage, that Ms. Wallace's attorneys requested records from the Cen-

ter to ensure that they had a complete picture of her course of treatment and to establish a baseline measure of Ms. Wallace's and E.Y.'s health and care prior to delivery. It would be reasonable for diligent lawyers to anticipate that other health care providers like the University Hospital and its staff might defend claims against them by at least investigating whether Ms. Wallace's prenatal care was up to proper standards of care. Looking into that evidence as part of a prudent investigation does not necessarily imply serious suspicion of negligence.

Both inferences are reasonable, and which one the trier of fact makes is crucial to Ms. Wallace's case. If we make the first inference, as the district court did in granting summary judgment, Ms. Wallace's suit is untimely; if we make the second, as the district court did in denying the government's motion to dismiss, it is not. And while it is not unusual for a district court to deny a motion to dismiss because pleadings are sufficient but to grant summary judgment because evidence is lacking, this case does not fit that model. At both procedural stages, the question was the significance of the records request to the Friend Center, and at least two inferences were and are reasonable. The district court erred in granting summary judgment for the government on the ground that Ms. Wallace's suit was untimely. See *Drazan*, 762 F.2d at 59–60 (court cannot infer claim accrual from mere fact of requesting records from treatment provider; the issue is why the records were requested).

We therefore REVERSE the district court's grant of summary judgment and REMAND for further proceedings consistent with this opinion.