In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1868

ARIANNA BLANCHE, a minor, by
LATOYA BLANCHE, guardian of
ARIANNA BLANCHE,

*Plaintiff-Appellant*,

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 7332 — **Thomas M. Durkin**, *Judge.*

ARGUED JANUARY 12, 2016 — DECIDED FEBRUARY 2, 2016

Before BAUER and HAMILTON, *Circuit Judges*, and PETERSON,[*] *District Judge.*

BAUER, *Circuit Judge*. Arianna Blanche ("Arianna"), by her mother and guardian Latoya Blanche ("Latoya"), filed suit

---

[*] Of the United States District Court for the Western District of Wisconsin, sitting by designation.

against the United States under the Federal Tort Claims Act ("FTCA") for injuries that Arianna sustained during birth. The United States moved for summary judgment, arguing that Arianna's claims were not timely under the FTCA's statute of limitations. The district court granted the motion, and Arianna appealed. For the reasons that follow, we affirm.

## I. BACKGROUND

While Latoya was pregnant with Arianna, she received her prenatal care at the Will County Community Health Center ("Health Center"), from February 11, 2008, to August 27, 2008, for a total of 12 visits. The Health Center received federal grant funding from the United States Public Health Service pursuant to 42 U.S.C. § 254b.

On September 2, 2008, Latoya entered the emergency room at Silver Cross Hospital and Medical Center ("Silver Cross") because she was suffering from abdominal pain. She was directed to the labor and delivery unit, where Dr. Husam Marsheh ("Dr. Marsheh") decided to induce labor. Although Dr. Marsheh was also affiliated with the Health Center, he did not treat Latoya during her prenatal care appointments.

During the delivery, Arianna became stuck in the birth canal. Dr. Marsheh had Latoya continue to push while he moved her into different positions. Latoya testified at her deposition that she was scared and that it felt like the baby was stuck for nearly 20 minutes, but she acknowledged that it was probably less. Latoya also testified that at some point, Dr. Marsheh "hollered" at the nurses and asked "Who was her doctor? Who was her doctor? Find out who her doctor was." Finally, after Dr. Marsheh had Latoya turn her body in a

certain position, she heard a "popping sound," and then Dr. Marsheh was able to deliver Arianna.

Arianna was born on September 4, 2008, and weighed 11.7 pounds (a condition known as "macrosomia," in which the child has a significantly larger than average birth weight). Once Arianna was born, several other doctors entered the room and rushed Arianna out. Latoya asked "What's wrong with my baby? What's wrong with my baby?" and began to cry. The nurses reassured her that Arianna was going to be alright. After giving birth, the next time Latoya saw Arianna was when Arianna was in the Intensive Care Unit, and her right arm was in a splint. When Latoya asked why Arianna's arm was in a splint, it was explained to her that Arianna sustained an injury during birth.

In addition, at some point after the delivery, Dr. Marsheh "apologized" to Latoya regarding Arianna's difficult birth. Latoya was questioned about this conversation several times in her deposition:

Q: You don't remember anything about [the conversation with Dr. Marsheh]?

A: No. The only thing that I remember Dr. Marsheh saying is after I had my baby was … . I remember him coming and apologizing to me. It was like, I'm sorry about the delivery of your baby and stuff like that. And that was all. I mean, I was just happy that my baby was alive … . [t]hat's all I remember.

Q: And he apologized to you. When was this?

A: I don't remember. I just remember him saying, I'm sorry for the delivery of your baby and all that other stuff.

…

Q: Tell me as closely as you can what exactly Dr. Marsheh said to you when he came in and apologized to you.

A: He was just saying that he was sorry, and I assumed that he was sorry for the birth of my baby and how that she was delivered.

…

Q: And so when Dr. Marsheh apologized for that, can you remember what his exact words were?

A: No. I just remember him saying that he was sorry.

Prior to leaving the hospital, Arianna was diagnosed with Erb's Palsy. Erb's Palsy involves the weakness of the arm as a result of an injury to the brachial plexus, the nerves surrounding the shoulder. Although Latoya knew of Arianna's diagnosis, she did not understand that Erb's Palsy involved damage to the nerves connecting to Arianna's right arm until over a year after the birth when Arianna was with a specialist at Children's Memorial Hospital in Chicago.

Latoya left Silver Cross and returned home with Arianna, whose right arm was still in a splint. Upon seeing Arianna's arm, Latoya's friends and family asked her if she had filed a lawsuit or retained a lawyer. Within one or two weeks after Arianna's birth, Latoya met with an attorney in Joliet, Illinois. In Latoya's deposition, she was asked why she sought out the

Joliet attorney, to which she responded: "I guess to pursue a lawsuit against the hospital, because of my [baby's] arm." Latoya ultimately did not retain this attorney because she did not believe he was a good lawyer.

After the meeting with the Joliet attorney, Latoya did not meet with another lawyer for almost a year. In August 2009, Latoya saw a law firm's television commercial that indicated that if your child suffered from Erb's Palsy, you may have a claim for medical malpractice and should call the telephone number listed. Latoya called the number and eventually retained counsel on August 10, 2009. In October 2009, the law firm sent requests for Latoya's medical records to Silver Cross and the Health Center. Counsel received her prenatal records from the Health Center in February 2010 and her complete labor and delivery records from Silver Cross in April 2010. Despite having all of the pertinent medical records by April 2010, counsel waited over a year before filing suit.

On May 4, 2011, Arianna, by her guardian and mother Latoya, filed a lawsuit in Illinois state court against the Health Center, Silver Cross, Dr. Marsheh, and the prenatal care providers from the Health Center. On November 29, 2011, the United States removed the matter to federal court, pursuant to 28 U.S.C. § 2679(d)(2) and 42 U.S.C. § 233, arguing that at the time of the incident, the Health Center, Dr. Marsheh, and the prenatal care providers at the Health Center were deemed employees of the United States for purposes of the FTCA. Upon removing the case, the United States filed a motion to dismiss for failure to exhaust administrative remedies pursu-

ant to 28 U.S.C. § 2675(a), which the district court granted on December 15, 2011.[1]

On February 10, 2012, Arianna, by her guardian and mother Latoya, presented her claim to the United States Department of Health and Human Services ("HHS"). On August 23, 2012, the HHS denied the claim under the FTCA's two-year statute of limitations, pursuant to 28 U.S.C. § 2401(b). On September 13, 2012, Arianna, by her guardian and mother Latoya, filed her complaint in the district court against the United States complaining of the injuries Arianna suffered resulting from the actions of Dr. Marsheh and the prenatal care providers. Her complaint makes several of the same allegations against both Dr. Marsheh and her prenatal care providers, such as failure to diagnose macrosomia, failure to offer Latoya the option to proceed by way of a Cesarean Section ("C-Section"), and inappropriately allowing Arianna to be delivered vaginally. The complaint also alleges that Dr. Marsheh "performed inappropriate maneuvers" and "applied excessive traction on the abdomen" during the delivery. In addition, the complaint states that Latoya's prenatal care providers failed to properly examine her and assess the size of her fetus, failed to "correlate the week 37 ultrasound findings with a clinical examination," and failed to determine the size of the fetus "during the prenatal work up and evaluation."

On March 17, 2015, the district court granted summary judgment in favor of the United States, holding that Arianna's

---

[1] The district court also remanded Arianna's lawsuit against Silver Cross to the Illinois state court.

claims against Dr. Marsheh and her prenatal care providers were barred by the statute of limitations. This appeal followed.

## II. DISCUSSION

We review the district court's grant of summary judgment *de novo*, and grant all reasonable inferences in favor of the non-moving party. *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 372–73 (7th Cir. 2007). Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

In this case, both the claims against Dr. Marsheh and against the prenatal care providers are treated as a lawsuit against the United States for purposes of the FTCA. 42 U.S.C. § 233(g). As a result, the FTCA statute of limitations applies, which states that a "tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within *two years after such claim accrues*." 28 U.S.C. § 2401(b) (emphasis added). However, the FTCA's "savings provision" allows a plaintiff's claims to proceed as timely if she filed a civil action within two years of her claim's accrual and presented the complaint to the appropriate federal agency within 60 days of her claim's dismissal. *See Arroyo v. United States*, 656 F.3d 663, 668 (7th Cir. 2011); *see also* 28 U.S.C. § 2679(d)(5).

Here, the FTCA's savings provision applies because Arianna presented her complaint to the HHS within 60 days of her claims' dismissal. But, she filed her initial civil action in Illinois state court on May 4, 2011. Therefore, the issue in this case is whether Arianna's claims against the United States

resulting from her delivery and her prenatal care accrued before May 4, 2009.

"An FTCA claim accrues when: (A) an individual actually knows enough to tip him off that a governmental act (or omission) may have caused his injury; *or* (B) a reasonable person in the individual's position would have known enough to prompt a deeper inquiry." *Arroyo*, 656 F.3d at 669 (emphasis in original). Thus, it allows for either a subjective analysis or an objective analysis. *Id.* (citation omitted). Further, medical malpractice claims do not accrue when the plaintiff knows that her injury was caused by a doctor. Rather, the accrual date is when the plaintiff has enough information to suspect, or a reasonable person would suspect, that the injury "had a doctor-related cause." *Id.* at 672–73 (citing *United States v. Kubrick*, 444 U.S. 111, 123 (1979)).

In its brief, the United States argues that if a birth injury occurs and the plaintiff reasonably suspects that it was caused by a doctor either during delivery *or* during her prenatal care, then the plaintiff's claims accrue against *all* doctors involved in her pregnancy. We disagree. In *E.Y. ex rel. Wallace v. United States*, we stated that:

> [w]hen a person suspects, or a reasonable per-
> son would suspect, that her injury was caused
> by negligent medical care, claims regarding
> other doctor-related causes of that injury that
> share a *time and place* with the injury's suspected
> cause also accrue … . However, claims that are
> *distinct in time*, *or distinct in place*, or that relate to

> a different injury do not accrue solely on that
> basis.

*E.Y. ex rel. Wallace v. United States*, 758 F.3d 861, 868 (7th Cir. 2014) (emphasis added) (relying on the standard suggested in *Goodhand v. United States*, 40 F.3d 209 (7th Cir. 1994)).[2] In *E.Y. ex rel. Wallace*, we went on to find that the plaintiff's claims against her prenatal care provider were sufficiently distinct in time and place from her claims against the delivery hospital, and thus her claims did not accrue at the same time. *E.Y. ex rel. Wallace*, 758 F.3d at 868.

In this case, Arianna brings claims against Dr. Marsheh for acts that occurred during delivery at Silver Cross (such as use of improper techniques), and claims against her prenatal care providers for acts that occurred while Latoya was at the Health Center (such as failure to correlate the ultrasound findings with Latoya's examination to determine that Arianna was too large for a vaginal birth). Therefore, since her complaint involves different doctors who committed different acts that were distinct in time and place, we will examine the claims against Dr. Marsheh and the prenatal care providers separately to determine when each accrued.

---

[2] The United States does not concede that the standard in *E.Y. ex rel. Wallace* is correct, but acknowledges in a footnote that it did not seek *en banc* review in *E.Y. ex rel. Wallace* and that the argument to reconsider the case is "for another day." Since the United States claims that it is still entitled to summary judgment regardless of *E.Y. ex rel. Wallace*, we will not re-examine the opinion.

### A.  Claims against Dr. Marsheh

We agree with the district court that the claims against Dr. Marsheh accrued sometime in September 2008, shortly after Arianna's birth. By the time Latoya left the hospital, she had experienced a difficult delivery, in which Arianna was lodged in the birth canal and had to be rushed to the Intensive Care Unit immediately after she was born. Arianna had to leave the hospital with her right arm in a splint, which Latoya understood was a result of the difficult delivery. Latoya also knew that Arianna weighed 11.7 pounds at birth, which is unusually large. Therefore, Latoya (or a reasonable person in Latoya's position) had enough information shortly after Arianna's birth to reasonably inquire into whether Dr. Marsheh caused the injury by inducing labor and delivering the baby vaginally instead of through a C-Section.[3]

Further, Latoya stated at her deposition that she met with an attorney to inquire into a possible case against the hospital within a week or two after Arianna's birth. She claimed she did not retain that attorney because she thought he was not a good lawyer, not because she thought Dr. Marsheh was not involved with Arianna's injury. This indicates that Latoya subjectively believed that Arianna's injury may have been caused by Dr. Marsheh's delivery.

---

[3]   Under the FTCA, the statute of limitations is not tolled during the putative plaintiff's minority; rather, the parent's knowledge is imputed to the minor plaintiff. *McCall ex rel. Estate of Bess v. United States*, 310 F.3d 984, 988 (7th Cir. 2002). There is an exception for cases where the parent or guardian has adverse interests to the best interests of the minor plaintiff, but this is not such a case. *Id.*

Regardless of Latoya's subjective beliefs, a reasonable person under the circumstances would have had enough information to inquire further into whether Dr. Marsheh caused Arianna's injury. Therefore, we hold that the statute of limitations on the claims against Dr. Marsheh began to run shortly after Arianna's birth in September 2008. Thus, the statute of limitations expired around September 2010, well before Arianna filed suit in May 2011.

Before we proceed, it is worth noting Dr. Marsheh's conversation where he "apologized" to Latoya shortly after Arianna's difficult birth. The district court and the United States claim that this should have led Latoya to inquire into whether Dr. Marsheh caused Arianna's injury. We reject this premise. First, Latoya's deposition testimony is unclear what exactly Dr. Marsheh said, other than that he was sorry. The United States argues that this constituted an apology, which in turn indicates an "acknowledgement of fault." In contrast, Arianna argues that it was merely an expression of sympathy. Since both are reasonable inferences, at this stage of the litigation we must view the conversation in Arianna's favor by finding that it was an expression of sympathy. Second, a doctor expressing his sympathy for a new mother who had just endured a painful delivery that resulted in an injured child should not be construed as a confession of malpractice. This is exactly the sort of "ghoulish consequence" that our circuit has long sought to prevent. *See Drazan v. United States*, 762 F.2d 56, 59 (7th Cir. 1985). "[T]he law should not encourage patients to assume their doctors are responsible for negative outcomes, let alone penalize patients who do not turn on their doctors at the first sign of trouble." *E.Y. ex rel. Wallace*, 758 F.3d at 867.

### B.  Claims Against the Prenatal Care Providers

We also agree with the district court that the statute of limitations for the claims against the prenatal care providers accrued shortly after Arianna's birth in September 2008. Latoya argues that she did not possess enough information to reasonably inquire into whether her prenatal care providers caused Arianna's injuries until after she saw the commercial discussing Erb's Palsy in August 2009. To support her argument, she analogizes her case to *E.Y. ex rel. Wallace*. By contrast, the United States argues that Latoya obtained sufficient information shortly after Arianna's birth, and analogizes this case to *Arteaga v. United States*, 711 F.3d 828 (7th Cir. 2013). Both cases are similar to the present matter.

In *E.Y. ex rel. Wallace*, the plaintiff gave birth to her child in April 2005, who was born limp and purple, possibly due to oxygen deprivation during a difficult delivery. 758 F.3d at 863–64. In May 2006, the child was diagnosed with diplegic cerebral palsy. *Id.* at 864. Shortly thereafter, the plaintiff met with her uncle (an attorney) who suggested that she seek legal counsel. *Id.* In November 2006, she signed a retainer agreement with a law firm. *Id.* On November 28, 2006, the law firm requested the plaintiff's prenatal care records, as well as her medical records from the delivery hospital. *Id.* On December 14, 2006, the plaintiff received a partial set of her prenatal care records, but did not receive her entire prenatal medical records until October 2007. *Id.* On December 10, 2008, she filed suit against her prenatal care providers and the doctor who delivered her child. *Id.* The district court granted summary judgment in favor of the United States, finding that the plaintiff's claims against her prenatal care providers

accrued by November 2006, when she requested her prenatal medical records. *Id.* at 864–65. We reversed, holding that the earliest time the plaintiff had sufficient information for a reasonable person to inquire into whether her prenatal care providers caused the child's injury was on December 14, 2006, when she received her partial prenatal medical records. *Id.* at 868 ("Only at that time was there a solid indication that something might have been amiss with her prenatal care, making that the first time that a reasonable person necessarily would have inquired further.").

In *Arteaga*, the plaintiff gave birth vaginally to a baby that weighed 11 pounds, but the child became stuck in the plaintiff's pelvis during the delivery. 711 F.3d at 830. As a result, the child injured the nerves in her shoulder. *Id.* The baby was born in July 2004, and the plaintiff obtained her medical records and met with an attorney a few months later. *Id.* That lawyer discouraged her from filing a lawsuit. *Id.* In October 2006, the plaintiff met with a second lawyer, who agreed to represent her, but then withdrew in February 2008. *Id.* In June 2009, the plaintiff consulted with a third lawyer, who referred her to a fourth lawyer, who then filed suit in March 2010 against the plaintiff's prenatal care providers. *Id.* We held that her claims accrued by the beginning of 2005 when the plaintiff, who had suspected that the child's injuries were preventable shortly after her birth, obtained the medical records and consulted with an attorney. *Id.* at 831.

Although in both *E.Y. ex rel. Wallace* and *Arteaga* the plaintiffs' claims against the prenatal care providers did not accrue until they received the medical records, we did not broadly hold in either case that a plaintiff's claim against a prenatal

doctor for a birth injury can never accrue until the plaintiff obtains the pertinent medical records. Further, we agree with the view expressed by the Second Circuit Court of Appeals that "[i]nstead of mechanically setting the date of accrual to coincide with the retention of counsel, the receipt of medical records, or any other event in the litigation process … we determine when [the plaintiff] … had reason to suspect that the injury [the child] suffered related in some way to the medical treatment [s]he received." *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 142 (2d Cir. 2011) (quotations and citation omitted).

By examining the circumstances to determine when Latoya had enough information to know or reasonably suspect that Arianna's injuries were caused by her prenatal care providers, we find that this case is distinguishable from *E.Y. ex rel. Wallace*. In *E.Y. ex rel. Wallace*, the plaintiff did not receive the child's diagnosis until a year after the delivery, and had no indication that her prenatal care could have caused the child's injury until she received the partial prenatal medical records. Here, although Latoya claims that it took a year for her to understand that Erb's Palsy involved nerve damage, it is undisputed that when she left the hospital she knew that Arianna was diagnosed with Erb's Palsy, that Arianna's arm was in a sling, that Arianna had weighed 11.7 pounds at birth which caused her to become lodged in the birth canal during delivery, and that Arianna's injury resulted from her delivery. A reasonable person would have inquired into whether the prenatal care providers caused Arianna's injury by failing to detect Arianna's weight beforehand and recommend a C-Section rather than a vaginal delivery. Also, similar to the

plaintiff in *Arteaga* (who experienced the same injury), Latoya was suspicious early on that the injury was preventable, as evidenced by her meeting with an attorney within a few weeks of Arianna's birth.

In addition, there is evidence that during the delivery, Latoya subjectively believed that her prenatal care providers caused Arianna's injury. When Arianna was lodged in the birth canal, Dr. Marsheh hollered, "Who was her doctor? Who was her doctor? Find out who her doctor was." At Latoya's deposition, she was asked what she understood Dr. Marsheh to mean, and she responded:

> I guess … he wanted to know, like, who took care of [me] while [I] was pregnant, because that was my first time I was seeing Dr. Marsheh, at the hospital … . I just felt like maybe he want to know details, like did they know that this was an enlarged baby or anything like that. Like did they even put it in the records? Why didn't they —didn't record this, that this was going to be a large baby, that he needs a C-section. I mean, from my perception. That's what I was thinking, like maybe he want to know why didn't nobody know that this baby was large?

Latoya's response suggests that she subjectively believed around the time of Arianna's birth that Arianna's injury may have been caused by her prenatal care providers failing to discover that she was too large for a vaginal delivery.

Later in her deposition, however, Latoya claimed that she did not know at that time what Arianna's size had to do with

her prenatal care provider. Regardless, as discussed above, a reasonable person under the circumstances would have had enough information shortly after the birth to reasonably believe that the prenatal care providers may have caused Arianna's injuries by failing to discover her large size and recommend a C-Section rather than a vaginal delivery. As a result, we hold that the claims against the prenatal care providers also accrued around September 2008. Thus, the two-year statute of limitations had expired before Arianna filed suit in May 2011.

## C. Equitable Tolling

Arianna argues alternatively that even if her claims accrued more than two years before her complaint was filed, equitable tolling should apply. Equitable tolling is reserved for rare instances in which a plaintiff was "prevented in some extraordinary way from filing his complaint in time." *Threadgill v. Moore U.S.A., Inc.*, 269 F.3d 848, 850 (7th Cir. 2001) (citation and quotation omitted). Generally, the plaintiff bears the burden to establish that (1) she "diligently" pursued her claim; and (2) "some extraordinary circumstances" prevented her from timely filing her complaint. *See Credit Suisse Securities (USA) LLC v. Simmonds*, 132 S. Ct. 1414, 1419 (2012) (citation omitted) (discussing "long-settled equitable-tolling principles"); *see also Menominee Indian Tribe of Wisconsin v. United States*, __ S. Ct. __, 2016 WL 280759, at *4 (2016) (holding generally that, "the second prong of the equitable tolling test is met only where the circumstances that caused a litigant's delay are both extraordinary *and* beyond its control.").

Latoya did not diligently pursue Arianna's claim. Although she met with an attorney within a few weeks of Arianna's birth, she failed to hire him because she did not think he was a good lawyer, and then did nothing else to pursue her potential lawsuit for almost a year. In addition, Latoya finally obtained counsel and had access to all of her medical records by April 2010, at which point she still had roughly five months to timely file suit. It is troubling that her lawsuit was not filed for over a year after this point, in May 2011. This indicates that not only did she fail to diligently pursue her claim, but her lawyers did as well.

In addition, we reject Arianna's argument that she was prevented from filing her complaint on time because the Health Center did not reveal its federal status. There is no evidence that the Health Center made any attempt to conceal its federal status. Rather, it appears that Arianna's lawyers did not adequately research into whether the Health Center was federally affiliated.

As we stated in *Arteaga*, the Public Health Service operates a website that identifies all health centers that receive federal funds and thus can only be sued under the FTCA. *Arteaga*, 711 F.3d at 834 ("Members of the medical malpractice bar should know enough to consult the website when approached by a prospective client."); *see also* U.S. Dep't of Health & Human Servs., *Find a Health Center*, http://findahealthcenter.hrsa.gov/ (last visited February 1, 2016). In this case, Arianna has not presented any evidence that her lawyers searched this database to determine the Health Center's federal status. Further, Arianna does not indicate whether her attorneys took any action to determine the Health Center's federal status. "It's not

asking too much of the medical malpractice bar to be aware of the existence of federally funded health centers that can be sued for malpractice only under the Federal Tort Claims Act." *Arteaga*, 711 F.3d at 834. Medical malpractice attorneys have an obligation upon being retained by a new client to research the possible defendants at issue. This research involves examining whether the possible defendants are federally affiliated, and thus can only be sued under the FTCA. *See, e.g.*, *A.Q.C. ex rel. Castillo*, 656 F.3d at 145 ("It is hard to understand why any lawyer … would not investigate the federal nature of potential defendants as part of standard due diligence in every medical malpractice case."). Therefore, equitable tolling is inappropriate in this case.

Arianna relies heavily on *Santos ex rel. Beato v. United States*, 559 F.3d 189 (3rd Cir. 2009), to support her equitable tolling argument. But *Santos* is distinguishable from this case. In *Arteaga*, we examined the *Santos* decision and emphasized that equitable tolling was appropriate in that case because the plaintiff had retained counsel within months of the child's injury, the plaintiff's counsel diligently researched the possible defendants, the state court suit was filed only five months late, the name of the provider "York Health Corporation" sounded like a private enterprise, and there was no "publicly available information" indicating the medical provider's federal status. *Arteaga*, 711 F.3d at 835. In contrast, here Latoya waited almost a year after Arianna's injury to retain counsel, counsel did not diligently research the Health Center's possible federal status, the state suit was filed eight months late (albeit not a significant difference), the name "Will County Community Health Center" sounds like a government entity rather than a private

enterprise, and there was a publicly available website that indicated the Health Center's federal status.

Arianna also argues that equitable tolling should apply regarding her claim against Dr. Marsheh because there was no reason for her to suspect that he was affiliated with the Health Center. The record shows that Latoya received all of her prenatal care at the Health Center and understood that the Health Center's physicians only delivered at Silver Cross. Further, Latoya agreed that that was one of the reasons she went to Silver Cross when she started suffering from abdominal pains. Therefore, she should have reasonably suspected that Dr. Marsheh was affiliated with the Health Center. Furthermore, there is no evidence that Arianna's counsel undertook any research to discern whether Dr. Marsheh was affiliated with the Health Center, nor does the record show that there were any impediments to discovering this information. Therefore, equitable tolling regarding the claims against Dr. Marsheh is also inappropriate.

## III.  CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.