In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-1142

P.W., a minor, by DOMINQUE WOODSON,
his mother and guardian, *et al.*,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:17-cv-00407-TLS-APR — **Theresa L. Springmann**, *Judge.*

ARGUED SEPTEMBER 18, 2020 — DECIDED MARCH 5, 2021

Before SYKES, *Chief Judge*, and HAMILTON and ST. EVE,
*Circuit Judges*.

ST. EVE, *Circuit Judge*. Dominque Woodson, individually
and on behalf of her minor son, P.W., brought this action
against the United States under the Federal Tort Claims Act
("FTCA") after P.W. sustained permanent injury to his left
arm during birth. The United States, which is a party to this
action because Ms. Woodson received pregnancy care at a

federally funded health center, moved to dismiss the action, or, in the alternative, for summary judgment, arguing that the Plaintiffs' claims were untimely. The district court granted summary judgment to the United States, and we affirm.

## I. Background

### A. Factual Background

Beginning in May 2013, and throughout the remainder of her pregnancy, Ms. Woodson received prenatal treatment from Dr. Keith Ramsey at NorthShore Health Centers. Dr. Ramsey wore a NorthShore nametag every time he treated her at NorthShore. During the course of treatment, Dr. Ramsey informed Ms. Woodson that she would likely need to deliver her baby by C-section because of the size of the baby. Ms. Woodson went into labor on December 7, 2013 and went to Anonymous Hospital to give birth to P.W.

Consistent with the delivery plan that she discussed with Dr. Ramsey, Ms. Woodson requested a C-section. For some reason, Dr. Ramsey diverged from the delivery plan and instead delivered P.W. vaginally. According to Ms. Woodson, the delivery was "traumatic." P.W. "got stuck on the way out" and had to be "yanked" out "with great force." Once P.W. was born, Ms. Woodson noticed immediately that something was wrong with his left arm—it "just sagged down to his side" and he appeared unable to move it.

Shortly after giving birth, Ms. Woodson raised her concerns about P.W.'s arm with Dr. Ramsey. Dr. Ramsey told Ms. Woodson that P.W.'s arm "may get better" and that he "may grow into it." Contrary to Dr. Ramsey's prediction, however, P.W.'s arm did not improve. After multiple follow-up visits with Dr. Ramsey and other healthcare providers over the

course of several months, Ms. Woodson decided to consult an attorney about her son's condition. Ms. Woodson retained Walter Sandoval as counsel on May 30, 2014, seeking to bring claims against Dr. Ramsey, NorthShore, and Anonymous Hospital.

NorthShore is a Federally-qualified health center ("FQHC") that receives federal funding and grant money from the United States Public Health Service under 42 U.S.C. § 1396d(l)(2)(B). NorthShore's status as an FQHC means that its employees are deemed employees of the Public Health Service and covered against malpractice claims under the FTCA. 42 U.S.C. § 233(g). The federal government maintains an online public database listing recipients of federal funding whose employees may be deemed employees of the Public Health Service for purposes of FTCA coverage. *See* data.hrsa.gov/tools/ftca-search-tool. NorthShore appears in this database. Sandoval, however, failed to recognize NorthShore's status as an FQHC. According to Sandoval, none of Ms. Woodson's medical records "indicated that NorthShore was a federal clinic, that Dr. Ramsey was an employee of NorthShore, or that Dr. Ramsey was a government employee."

Sandoval researched information in the public domain—Dr. Ramsey's independent website, NorthShore's website, and the United States Public Health Service's website—none of which, according to Sandoval, represented Dr. Ramsey as an employee of NorthShore or identified NorthShore as a federal clinic. Although NorthShore's website listed Dr. Ramsey as one of its doctors, Sandoval did not understand that to mean that he was a NorthShore employee. And while NorthShore's website had a logo with the label, "Community

Health Center FQHC," Sandoval claims he was unaware of NorthShore's federal status because the website did not specifically indicate that the clinic was an "FTCA Deemed Facility" when Ms. Woodson retained him as counsel.

Sandoval also reviewed the Indiana Department of Insurance ("IDOI") and Indiana Patient's Compensation Fund online databases and learned that Dr. Ramsey and Anonymous Hospital were "qualified" providers under the Indiana Medical Malpractice Act. Sandoval apparently misunderstood this "qualified" status under Indiana law as precluding any potential federal status.

**B. Procedural Background**

On December 18, 2014, Plaintiffs filed a proposed complaint against Dr. Ramsey and Anonymous Hospital with the IDOI, alleging that Dr. Ramsey and Anonymous Hospital negligently rendered prenatal and delivery care.[1] The IDOI responded to Sandoval on January 1, 2015, confirming that Dr. Ramsey and Anonymous Hospital were "qualified" providers under the Medical Malpractice Act, and informing Sandoval that it had forwarded copies of the complaint to Dr. Ramsey and his insurance carrier. These claims remain pending and no person or entity has appeared on Dr. Ramsey's behalf.

On December 16, 2015, counsel for NorthShore informed Sandoval that NorthShore was a federally funded health center, and that Dr. Ramsey was a federal employee. Plaintiffs

---

[1] To bring an action for malpractice under the Indiana Medical Malpractice Act, a plaintiff must first file a proposed complaint with the IDOI. Ind. Code § 34-18-8-4.

then filed administrative tort claims with the Department of Health and Human Services ("HHS") on February 19, 2016. HHS denied their claims on April 26, 2017.

On October 26, 2017—nearly three years after P.W.'s birth—Plaintiffs filed this action in the United States District Court for the Northern District of Indiana, alleging negligent prenatal care and delivery of P.W. against both the United States and Anonymous Hospital. The United States moved to dismiss the complaint, or, alternatively, for summary judgment. Treating the United States' motion as one for summary judgment, the district court determined that Plaintiffs' claims accrued on December 7, 2013, the day P.W. was born. Plaintiffs' claims were therefore untimely under the FTCA's two-year statute of limitations. The court entered judgment for the United States. This appeal followed.

## II. Discussion

We review a district court's grant of summary judgment de novo, considering all facts and drawing all inferences in the light most favorable to the nonmoving party. *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020).

It is undisputed that the FTCA's statute of limitations applies and bars any claim against the United States "unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b). The parties' dispute here centers on when Plaintiffs' claims accrued.

The district court found that Plaintiffs' claims accrued on December 7, 2013, the date Ms. Woodson gave birth to P.W. The district court's application of the relevant claim accrual

rule is a legal determination, which we review de novo. *Arroyo v. United States*, 656 F.3d 663, 667 (7th Cir. 2011).

## A. Claim Accrual Under the FTCA

Plaintiffs presented their claims to HHS on February 19, 2016. Under the FTCA's two-year statute of limitations, Plaintiffs' claims are therefore untimely if they accrued before February 19, 2014.

There are two ways for a claim to accrue under the FTCA—one subjective and the other objective. An FTCA claim accrues when either: "(1) the individual becomes subjectively aware of the government's involvement in the injury, or (2) the individual acquires information that would prompt a reasonable person to inquire further into a potential government-related cause of the injury, whichever happens first." *E.Y. ex. rel. Wallace v. United States*, 758 F.3d 861, 866 (7th Cir. 2014). In other words, "[a] plaintiff's claim accrues the first time the plaintiff knew, or a reasonably diligent person in the plaintiff's position, reacting to any suspicious circumstances of which he or she might have been aware, would have discovered that an act or omission attributable to the government could have caused his or her injury." *Arroyo*, 656 F.3d at 669. Plaintiffs contend that their claims did not accrue until May 30, 2014, the day they retained Sandoval as counsel. We disagree.[2]

---

[2] The dissent takes issue with our willingness to decide a claim accrual issue in the summary judgment context. It is worth noting, however, that it is not atypical for these issues to be decided at summary judgment. *See Blanche v. United States*, 811 F.3d 953 (7th Cir. 2016).

As we explained in *Blanche v. United States*, 811 F.3d 953
(7th Cir. 2016), "[i]nstead of mechanically setting the date of
accrual to coincide with the retention of counsel, the receipt
of medical records, or any other event in the litigation pro-
cess," we ask when the plaintiff "had reason to suspect that
the injury [the child] suffered related in some way to the med-
ical treatment [s]he received." *Blanche*, 811 F.3d. at 961 (alter-
ations in original) (quoting *A.Q.C. ex rel. Castillo v. United
States*, 656 F.3d 135, 142 (2d Cir. 2011)). Contrary to her sug-
gestion, Ms. Woodson's retention of Sandoval on May 30,
2014, has no automatic significance, as the mere hiring of a
lawyer is not a triggering event. *See id.* Particularly here,
where Ms. Woodson did not require Sandoval's review of the
medical records to understand the traumatic delivery as a po-
tential cause of P.W.'s injury (nor does she argue otherwise),
the date that Ms. Woodson retained Sandoval is of little im-
portance to our analysis. Instead, we apply the "discovery
rule" and ask when Ms. Woodson discovered or should have
discovered the cause of her injury. *See id.* Applying this rule,
we agree with the district court that Plaintiffs' claims accrued
shortly after P.W. was born.[3]

In the course of Ms. Woodson's prenatal care, Dr. Ramsey
told Ms. Woodson that her son would likely require delivery
by C-section because of his unusually large size. When it was

---

[3] The dissent places significant weight on our conclusion that the
claims accrued shortly after P.W.'s birth, rather than attributing Ms.
Woodson's inquiry notice to an exact moment in time. According to the
dissent, this language is evidence of the "factual uncertainty" underlying
the claim accrual date in this case. By Ms. Woodson's own account, how-
ever, she "knew something was wrong" with P.W.'s arm "[s]hortly after
the delivery."

time to give birth, however, Dr. Ramsey changed course and delivered P.W. vaginally without explaining his deviation from the delivery plan. Although this fact alone is insufficient, this unexplained change in course contributed to Ms. Woodson's mix of information that something was amiss. In addition, Ms. Woodson herself described the delivery as "very traumatic"—P.W. "got stuck" in the birth canal during delivery and had to be "yanked" out, seemingly because of his large size. Then, immediately after giving birth, Ms. Woodson looked at her son's arm and "knew something was wrong." She was worried enough to raise her concern with Dr. Ramsey, who offered little solace, saying only that P.W.'s arm "may get better" and that he "may grow into it." But as Ms. Woodson would soon discover, P.W.'s arm did not, in fact, get better. Instead, her instinct after the delivery that "something was wrong with P.W.'s left arm" proved accurate.

This case resembles *Blanche*, where we similarly held that the plaintiff's claims accrued on the day she gave birth or shortly thereafter. In that case, the plaintiff gave birth to an 11.7-pound baby (larger than average birth weight) who got stuck in the birth canal during delivery. *Blanche*, 811 F.3d at 955. In addition, the child left the hospital with her arm in a splint. *Id.* at 956. We held that the plaintiff "had enough information shortly after [the child's] birth to reasonably inquire into whether [the obstetrician] caused the injury by inducing labor and delivering the baby vaginally instead of through a C-Section." *Id.* at 959.

Contrary to Plaintiffs' assertions, Ms. Woodson did not need specific information showing that Dr. Ramsey caused the injuries. Like the plaintiff in *Blanche*, Ms. Woodson had enough information shortly after she gave birth to P.W. to

prompt her to inquire whether the manner of delivery caused
P.W.'s injury. In fact, she did make an initial inquiry by rais-
ing her concerns about P.W.'s arm with Dr. Ramsey.

In *Nemmers v. United States*, 795 F.2d 628 (7th Cir. 1986), we
recognized that traumatic birth experiences alone are not
enough to start the running of the statute of limitations. In
*Nemmers*, after a bench trial, the district court held that a
child's cerebral palsy and mental disability were caused by
negligent medical treatment by physicians at a naval hospital
before and after his birth. We clarified that the statute of limi-
tations began to run when "a reasonable person would know
enough to prompt a deeper inquiry into a potential cause … ."
*Nemmers*, 795 F.2d at 632. Thus, the statute of limitations for
the FTCA claim did not begin to run until the plaintiff (the
child's mother) learned that her doctor's actions might have
contributed to her child's injury. Plaintiff's knowledge of the
traumatic birth alone was not enough to trigger the statute of
limitations because it was insufficient to suggest to a reasona-
bly diligent person that the complications at birth were a po-
tential cause of the cerebral palsy and mental disabilities. In-
stead, the statute of limitations started running several years
later, when either another doctor informed her of the possi-
bility that the birth caused the child's injuries, or when she
read a newspaper article about a child suffering from similar
injuries known to have been caused by inadequate care dur-
ing delivery. We remanded the case to the district court to de-
cide which of those two events triggered the statute of limita-
tions.

We emphasize again here that a traumatic birth does not
automatically trigger the statute of limitations. An unfortu-
nate outcome of a medical procedure is not alone a triggering

event. Something more is required. Indeed, the law is not meant to encourage plaintiffs to "assume that their injuries can be attributed to shortcomings in the care they received." *Arroyo*, 656 F.3d at 671. There must be other circumstances, as there are here, that would prompt a reasonable person to investigate the potential cause of the injury. Here, Plaintiffs had those additional circumstances shortly after P.W.'s birth: Despite acknowledging during Ms. Woodson's prenatal care the risks of delivering an unusually large baby vaginally, Dr. Ramsey opted to do so anyway, ignoring his prior determination that P.W. should be delivered by C-section; P.W. "got stuck" during delivery—something that could not have happened if P.W. had been delivered by C-section; Ms. Woodson described the delivery as "traumatic"; P.W. was born with a visibly injured arm; and P.W. could not move his arm after birth. Unlike in *Nemmers*, where the child's injury—cerebral palsy or muscular dystrophy—could not be confirmed until the child was 18 months old, P.W.'s injury was immediately evident—his left arm "just sagged down to his side" and he "could not move his left arm at all." Plaintiffs have not identified any other subsequent event that alerted Ms. Woodson to the government's involvement in P.W.'s injury. "Once knowledge of the cause is available, any delay in pursuing the cause and developing a case rests with the would-be plaintiff." *Nemmers*, 795 F.2d at 632.

The dissent takes issue with our holding because in its view, "[i]n prior birth-injury cases where we have found 'something more,' there has been much more." This mischaracterizes our case law. In *Arteaga v. United States*, 711 F.3d 828 (7th Cir. 2013), a case which the dissent cites as having had "much more" marking inquiry notice, the plaintiff had "obtained the pertinent medical records and given them

to a lawyer to review." *Arteaga*, 711 F.3d at 831. This was evidence of the plaintiff's subjective awareness of the potential government-related cause of her child's injury. But as we have explained, the standard for determining when a claim under the FTCA accrues "has two *alternative* tests: a subjective one focused on the plaintiff's actual knowledge, and an objective one based on the knowledge of a reasonable person in the plaintiff's position." *Wallace*, 758 F.3d at 865 (emphasis added). Evidence that a plaintiff did, in fact, make a deeper inquiry into a potential government-related cause is not required to show that the plaintiff had enough information such that a reasonable person would have inquired further.

The dissent's reliance on *Blanche* is similarly misplaced. We noted there that the plaintiff's decision to meet with an attorney two weeks after giving birth indicated her subjective belief that her doctor caused her daughter's injury. But this fact was not dispositive, because "[r]egardless of [the mother's] subjective beliefs, a reasonable person under the circumstances would have had enough information to inquire further into whether [the obstetrician] caused [the child's] injury." *Blanche*, 811 F.3d at 959.

Plaintiffs further argue that even if Ms. Woodson had knowledge of the injury and suspected that Dr. Ramsey may have contributed to the injury on the day she gave birth, she could not have known at that time that Dr. Ramsey was a government employee. Our decision in *Arteaga* largely forecloses Plaintiffs' argument. We explained in *Arteaga* that when a plaintiff is "armed with such knowledge" of injury and a likely cause of that injury, "the prospective plaintiff should be able to discover within the statutory limitations period the

rest of the facts needed for drafting a complaint that will with-stand a motion to dismiss." *Arteaga*, 711 F.3d at 831–32. "That the defendant is suable only under the Federal Tort Claims Act is one of those facts." *Id.* "Members of the medical mal-practice bar should know enough to consult the [Public Health Service] website when approached by a prospective client." *Blanche*, 811 F.3d at 962; *Arteaga*, 711 F.3d at 834.

The district court properly determined that Plaintiffs' claims accrued on December 7, 2013, shortly after P.W.'s birth. Plaintiffs did not present their claims to HHS until February 19, 2016, more than two years after the claims accrued. Plain-tiffs' claims are therefore untimely. This is a sympathetic case, but the district court did not err.

**B. Savings Clause of the Westfall Act**

Under the FTCA's "savings provision," which Congress added to the FTCA through the Westfall Act, "a plaintiff's claim will be considered timely if: (1) he filed a civil action that contained his claim within two years of his claim's ac-crual; and (2) he presented his claim to the appropriate federal agency within sixty days of his civil suit's dismissal." *Arroyo*, 656 F.3d at 668; 28 U.S.C. § 2679(d)(5).[4]

---

[4] The government points out that, as a preliminary matter, a separate statute—42 U.S.C. § 233(g)—addresses federally funded health centers. This section, at least on its face, does not appear to foreclose application of the Westfall Act to federally funded health centers. *See Helms ex rel. Taylor v. Atrium Health Care & Rehab. Ctr. of Cahokia, LLC,* 2010 WL 3937606, at *2 (S.D. Ill. Oct. 5, 2010) (noting that "employees" for purposes of the Westfall Act include federally funded health centers and their employees) (citing *Jacobs v. Castillo*, 612 F.Supp.2d 369, 372 (S.D.N.Y. 2009)). We need not

Plaintiffs argue that even if their claims accrued on December 7, 2013, they are nonetheless timely under the savings provision. Because Plaintiffs filed a proposed complaint with the IDOI under the Indiana Medical Malpractice Act in December 2014, well within the two-year statute of limitations, they assert that this action falls within the savings provision. Plaintiffs, however, do not satisfy the second element of the savings provision because the IDOI never dismissed Plaintiffs' claims, as required under 28 U.S.C. § 2679(d)(5)(B). Thus, the FTCA's savings provision is of no use to Plaintiffs.

## C. Equitable Estoppel and Equitable Tolling

In a last-ditch attempt to save their claims, Plaintiffs argue in the alternative that their claims qualify for equitable estoppel or equitable tolling. Both arguments fail.

For equitable estoppel to apply, the government must have engaged in "affirmative misconduct." *United States v. Bob Stofer Oldsmobile-Cadillac, Inc.*, 766 F.2d 1147, 1151 (7th Cir. 1985). Thus, if Dr. Ramsey or NorthShore had fraudulently concealed their "status in order to deceive potential plaintiffs into thinking the applicable statute of limitations longer than it is," Plaintiffs' claims might qualify for equitable estoppel, "which tolls a statute of limitations when for example the defendant took improper steps to delay the filing of the suit beyond the statutory deadline." *Arteaga*, 711 F.3d at 833.

Plaintiffs have not identified any affirmative misconduct by Dr. Ramsey or NorthShore. Instead, Plaintiffs argue only that the physician-patient relationship creates a duty to

decide this issue here, however, as Plaintiffs' argument fails on other grounds.

disclose federal employment status. But as we have explained before: "No physician, clinic, hospital, or other medical provider is required to provide patients with detailed instructions on how to sue the provider for malpractice." *Id.* at 834. Neither Dr. Ramsey nor NorthShore had a duty to inform Ms. Woodson of their federal status—it is enough that NorthShore's website disclosed its federal status and listed Dr. Ramsey as one of its doctors.[5]

Plaintiffs' equitable tolling argument fares no better than their equitable estoppel argument. "Equitable tolling is reserved for rare instances in which a plaintiff was 'prevented in some extraordinary way from filing his complaint in time.'" *Blanche*, 811 F.3d at 962 (quoting *Threadgill v. Moore U.S.A., Inc.*, 269 F.3d 848, 850 (7th Cir. 2001)). "Generally, the plaintiff bears the burden to establish that (1) she 'diligently' pursued her claim; and (2) 'some extraordinary circumstances' prevented her from timely filing her complaint." *Id.* (quoting *Credit Suisse Securities (USA) LLC v. Simmonds*, 566 U.S. 221, 227 (2012)).

Plaintiffs cannot establish either element. NorthShore appears in the relevant Public Health Service database. We have twice reminded the medical malpractice bar of this database. *Blanche*, 811 F.3d at 962; *Arteaga*, 711 F.3d at 834. Sandoval's examination of other websites is unavailing given our direct guidance. In addition, the presence of an "FQHC" logo on

---

[5] Plaintiffs add that Dr. Ramsey engaged in fraudulent concealment because his personal website represented that he performed obstetrics in his private practice when he in fact did not. Dr. Ramsey never treated Ms. Woodson in his private practice, so this alleged misrepresentation has no bearing on her claims.

NorthShore's website is reason enough to reject Plaintiffs' request for equitable tolling. *Arteaga*, 711 F.3d at 833–34. In light of the Public Health Service database, "[i]f the lawyer fails in [his duty to determine the provider's federal status], the remedy is not to punish the defendant by depriving him of the protection of the statute of limitations; it is for the plaintiff to sue the lawyer who misadvised him for legal malpractice." *Id.* at 834.

AFFIRMED.

HAMILTON, *Circuit Judge*, dissenting. We should reverse the summary judgment on the government's statute of limitations defense. The factual uncertainty in this case is evident in the majority's vague holding that plaintiffs' claims accrued "shortly after" P.W.'s birth. A reasonable trier of fact could find that plaintiffs' medical malpractice claims did not accrue within scarcely ten weeks after P.W.'s birth. More generally, we should not apply the statute of limitations so that a poor medical outcome immediately puts a patient on "inquiry notice," meaning that she should quickly consult a lawyer to investigate a possible claim of malpractice. The majority denies it is adopting that rule, but the denial is not consistent with the majority's logic. I respectfully dissent.

The general rule is that a tort claim against the federal government accrues when the plaintiff discovers, or a reasonable person in the plaintiff's position would have discovered, that she has in fact been injured by an act or omission attributable to the government. *E.Y. ex rel. Wallace v. United States*, 758 F.3d 861, 865 (7th Cir. 2014); *Arroyo v. United States*, 656 F.3d 663, 668 (7th Cir. 2011). We have also applied a standard of inquiry notice: a claim accrues "when an individual acquires information that would prompt a reasonable person to make 'a deeper inquiry into a potential [government-related] cause.'" *Arroyo*, 656 F.3d at 669, quoting *Nemmers v. United States*, 795 F.2d 628, 632 (7th Cir. 1986).

In *Wallace* we summarized the two standards, holding that "a plaintiff's medical malpractice claim against the federal government accrues when either (1) the individual becomes subjectively aware of the government's involvement in the injury, or (2) the individual acquires information that would prompt a reasonable person to inquire further into a potential

government-related cause of the injury, whichever happens first." 758 F.3d at 866, citing *Arteaga v. United States*, 711 F.3d 828, 831 (7th Cir. 2013); *Arroyo*, 656 F.3d at 669; and *Drazan v. United States*, 762 F.2d 56, 58–59 (7th Cir. 1985).

How we apply the general standard of inquiry notice here has consequences both for the parties before us and more broadly for doctor-patient relationships. We have long tried to make clear that we do not expect patients with less-than-optimum outcomes to run to a malpractice lawyer:

> The relationship between doctor and patient is built on trust. Doctors have the obligation to care for their patients and the specialized knowledge to make good medical choices and to deliver effective care. Patients typically lack specialized medical knowledge and are unable to assess and treat their own maladies. They put their trust in doctors to provide competent medical care. And all should recognize that even the best medical care cannot guarantee a good outcome. *A negative outcome of medical care is not proof of negligence.* Given the complexities of the human body, its injuries and illnesses, and medical treatment, and the special relationship between doctor and patient, *the law should not encourage patients to assume their doctors are responsible for negative outcomes, let alone penalize patients who do not turn on their doctors at the first sign of trouble.*

*Wallace*, 758 F.3d at 867 (emphases added); accord, *Arroyo*, 656 F.3d at 671–72 (reiterating circuit's rejection of a rule requiring "all reasonable persons who suffer injuries while under the

care of medical professionals [to] assume that their injuries can be attributed to shortcomings in the care they received"); *Nemmers*, 795 F.2d at 631 ("the statute of limitations should not be construed to compel everyone who knows of an injury to scour his medical records just in case the government's physician did something wrong"); *Drazan*, 762 F.2d at 59 (rejecting rule that would have the "rather ghoulish consequence" of requiring such investigations).

The majority strays from these sound precedents. It applies the inquiry notice standard in an extraordinarily harsh way, and on summary judgment, no less. It penalizes a first-time mother for not realizing, within scarcely *ten weeks* of her baby's birth, that she should find help to investigate whether her baby had been injured by malpractice. For jaded lawyers and federal judges, perhaps the need for investigation seems obvious—especially with the benefit of hindsight. Yet that is not the standard. We need to focus on the reasonable *patient*, in the situation she faced just after giving birth. And we need to keep in mind the trust at the heart of the doctor-patient relationship.

P.W. was born on December 7, 2013, which is the earliest arguable date of accrual. His mother consulted and retained a medical malpractice lawyer on May 30, 2014, which is the latest arguable date of accrual. She was on inquiry notice by then. The critical date for the statute of limitations falls in the middle of that five-month stretch: February 19, 2014. Plaintiffs served their FTCA notice of claim two years later, on February 19, 2016.

Without picking a specific date or event that started the clock, the majority holds as a matter of law that Ms. Woodson had enough information "shortly after" she gave birth— but

some unspecified time before February 19, 2014— to prompt her to inquire whether negligence on the part of Dr. Ramsey caused P.W.'s injury.[1]

The majority tells us that traumatic birth experiences alone are not enough to trigger the statute of limitations—"Something more is required." Ante at 9–10. I agree with that general principle. The problem is that the majority does not actually require anything more. In footnote 3, the majority shows what it's really doing. It ties the accrual "shortly after the delivery" to Ms. Woodson's knowledge that she "knew something was wrong" with her baby's arm then. That's the negative medical outcome, *and nothing more*.

In trying later to identify "something more," the majority bases its decision on facts that were already inherent in that "traumatic birth experience." The majority highlights that P.W. "got stuck" during the delivery, that Ms. Woodson described the delivery as "traumatic," and that P.W. was born with a visibly injured, immobile left arm. A moment's reflection shows that these circumstances *are* "the traumatic birth experience." They cannot provide the "something more" than the traumatic birth experience that the majority tells us is not enough to start the statute of limitations clock.

Two additional facts might be candidates for "something more," but neither suffices. The first is that before birth, Dr. Ramsey had determined that P.W. should be delivered by C-section and then took a different course in the actual delivery. The second is that at some unspecified time after the birth, Ms.

---

[1] The majority disagrees with the district court on this issue. The district court held that the cause of action accrued at birth, on December 7, 2013.

Woodson was worried about P.W.'s left arm and asked Dr. Ramsey about it. The doctor responded that his arm "may get better" and that "he may grow into it." Separately or together, these were not enough to put a reasonable person in Ms. Woodson's position on notice that she should investigate the possibility of medical malpractice, and certainly not beyond reasonable dispute. As we said in *Wallace*, the relationship between doctor and patient is built on trust, even the best medical care cannot guarantee a good outcome, and patients need not turn immediately to malpractice lawyers.

We can assume that Dr. Ramsey changed his mind about how to deliver P.W., but from his patient's perspective, he was the specialist, the expert. Surely, a patient could assume, the doctor would have made that decision with his professional expertise. At the very least, a reasonable trier of fact could find that this change of course was not enough to put every reasonable person in Ms. Woodson's position on notice that she needed to start thinking about a malpractice claim within a few weeks.

As for Ms. Woodson's question to Dr. Ramsey, any parent of course would ask what's wrong and will it get better? This is the most basic and initial inquiry about a child's health.[2] Dr. Ramsey gave a vague reply, but the majority does not explain why that vagueness should have made every reasonable parent in Ms. Woodson's position suspect malpractice and start investigating. Her knowledge that something was wrong with P.W.'s arm does not amount to knowledge or suspicion

---

[2] In fact, at one point the majority correctly characterizes Ms. Woodson's question to Dr. Ramsey as an "initial inquiry." Ante at 9.

of malpractice—at least not at that time. As noted, our prece-
dents do not penalize patients for not turning on their doctors
at the first sign of trouble. *Wallace*, 758 F.3d at 867; *Arroyo*, 656
F.3d at 671–72; *Nemmers*, 795 F.2d at 631; *Drazan*, 762 F.2d at
59.

In prior birth-injury cases where we have found "some-
thing more," there has been much more. Something more
than a difficult delivery and an injury. One easy marker of in-
quiry notice has been an overt act indicating suspicion—for
example, obtaining prenatal medical records or meeting with
a lawyer—"that the injury had been preventable." *Arteaga*,
711 F.3d at 831. For example, in *Arteaga*, we held that the claim
had accrued by the time the plaintiff had "obtained the perti-
nent medical records and given them to a lawyer to review."
*Id*. Similarly, in *Blanche v. United States*, 811 F.3d 953, 961 (7th
Cir. 2016), the statute of limitations clock began running when
the plaintiff met with an attorney within a week or two of her
baby's birth. Here, we have no similar action until nearly six
months after birth and three months after the decisive date. In
no case before today have we found that a birth-injury claim
had accrued with as little foundation as the majority accepts
in this case, and as a matter of law.[3]

At least as far back as 1985 in *Drazan*, 762 F.2d 56, we have
rejected a rule that would encourage patients to assume that
their doctors' negligence caused poor outcomes—a rule that

---

[3] Another portion of the *Blanche* opinion suggests that the birth injury
alone was enough to start the statute of limitations clock. See 811 F.3d at
959. That portion is best viewed as dicta, inconsistent with our other cases
saying that a poor medical outcome is not enough for accrual, and unnec-
essary to the decision in light of the mother's almost immediate consulta-
tion with a lawyer.

would encourage "would-be plaintiffs to engage in paranoid investigations of everyone who has ever provided them with medical care." *Wallace*, 758 F.3d at 867. Patients like Ms. Woodson, twenty-four years old and a first-time mother, should not be penalized for trusting their doctors and seeking their advice and counsel following a difficult delivery and an evident injury. Because a reasonable trier of fact could find that Ms. Woodson was not on notice to inquire into the possibility of medical malpractice until after February 19, 2014, I dissent from affirmance of summary judgment for the government. And despite the majority's disclaimers, future plaintiffs and their counsel would be well-advised to take a cautious approach to the FTCA statute of limitations. Today's decision creates a significant risk that the poor medical outcome alone may deemed sufficient to start the statute of limitations clock.

Ms. Woodson's case is frustrating for a second reason. Even under the majority's view of the accrual of her claims, Ms. Woodson still consulted her medical malpractice lawyer more than a year and a half before the FTCA's two-year limit expired. At least with the benefit of hindsight, it appears that her lawyer had ample time to look into the possibility that Dr. Ramsey might have been covered by the FTCA in delivering P.W.

Plaintiffs' attorney took a timely, critical step under Indiana law on December 18, 2014, just after P.W.'s first birthday, by filing a proposed malpractice complaint with the Indiana Department of Insurance. The department administers the review of such claims before a complaint may be filed in court against a covered provider. The proposed complaint was filed and served about a year before the FTCA statute of limitations

expired. What the attorney did not do was figure out that Dr. Ramsey might have been negligent *while acting as an agent of the federal government*, so that a claim under the FTCA would need to be served within two years of accrual "shortly after" the December 7, 2013 birth.[4]

This case highlights some procedural traps for a medical malpractice plaintiff and her lawyer. Dr. Ramsey's working situations epitomize the complexity of modern delivery of health care. While he cared for Ms. Woodson, he was wearing as many as ten different figurative hats when he practiced medicine. His resumé and deposition testimony indicate: (a) that he had his own private practice covered by a private insurance company, (b) that he was employed by NorthShore and covered by the FTCA, (c) that he was employed by the State of Illinois (without insurance) and by a hospital in Illinois with another insurer, and (d) that he was a staff physician for at least four hospitals in northwest Indiana and (e) that he was a volunteer at four or five other institutions. To complicate matters more, Dr. Ramsey testified that his insurance coverage and authority under Indiana and Illinois may have been limited to gynecology, without obstetrics, and that although his private website listed obstetrics as a specialty, that was a mistake.

We must assume for now that Dr. Ramsey was negligent in delivering P.W. But it matters, and matters a lot, whether

---

[4] Plaintiffs have offered evidence that (a) shortly after the proposed complaint was filed with the state agency, Dr. Ramsey, his private insurer, and the Office of the United States Attorney all recognized that the FTCA could apply, but (b) none told plaintiffs' attorney or even hinted at that possibility until it was too late for him to file a timely complaint according to the district court's and possibly the majority's analyses.

he was negligent as an employee or agent of a federal community health clinic, as a private practitioner, or as a member of the medical staff of the still-anonymous hospital where P.W. was born, or perhaps as two or all three. That threshold question may require a trial to answer. The answer may determine the right procedures, the right forum(s), the choice of the governing law, and the available insurance and damages.

I agree with the majority that plaintiffs' attorney could have and should have ascertained well before the two-year period expired that in caring for Ms. Woodson and her baby, Dr. Ramsey might have been covered at least in part under the FTCA. The attorney should have recognized that Dr. Ramsey treated Ms. Woodson before the birth at NorthShore, that NorthShore's website had a logo with the label "Community Health Center FQHC," and that NorthShore's website listed Dr. Ramsey as one of its doctors. Even if the attorney was briefly led astray by Dr. Ramsey's and the anonymous hospital's status under the Indiana Department of Insurance process, he had time to realize that the state malpractice processes might not cover all possibilities and to correct course. That did not happen. We do not yet know what the final consequences will be for plaintiffs, their lawyer, and the defendants.

In this vague and complex area of law, the stakes are high. As we said in *Arteaga*: "No physician, clinic, hospital, or other medical provider is required to provide patients with detailed instructions on how to sue the provider for malpractice." 711 F.3d at 834. Plaintiffs' lawyers must educate themselves on the relevant statutes of limitations, public health databases, and case law—both federal and state. See *Blanche*, 811 F.3d at 962; *Arteaga*, 711 F.3d at 834–35. If they do not, their clients may be left with no recourse against a negligent doctor so that they

can pursue only a negligent lawyer. It's too early to know whether that will be these plaintiffs' only recourse. We are told that plaintiffs' claims are still pending before the Indiana Department of Insurance as a prelude to going to state court. Relief may be available in those non-federal forums, particularly since, as I understand plaintiffs' case, their focus is not on prenatal care at NorthShore but on P.W.'s delivery in the hospital. Still, in state court the defendants will have obvious incentives to point any blame toward Dr. Ramsey's federal work. P.W. just turned seven years old, but unfortunately, the litigation over his birth injuries may have barely begun.